**BAKER'S CARPET GALLERY, INC., Plaintiff,**

v.

**MOHAWK INDUSTRIES, INC., Defendant.**

**Civil Action No. 4:94–CV–0101–HLM.**

United States District Court, N.D. Georgia, Rome Division.

Sept. 23, 1996.

Tony Glen Powers, Rogers & Hardin, Atlanta, GA, for Baker's Carpet Gallery, Inc.

Robert D. McCallum, Jr., Randall Lee Allen, Beth Kirby Toberman, Alston & Bird, Atlanta, GA, for Mohawk Industries, Inc.

## ORDER

HAROLD L. MURPHY, District Judge.

This is an antitrust case in which Plaintiff claims that Defendant unlawfully perpetuated and enforced a resale price maintenance agreement in violation of the Sherman Act. 15 U.S.C.A. § 1 *et seq.* (1973). Plaintiff also alleges that Defendant illegally terminated Plaintiff's exclusive distribution rights after Plaintiff failed to abide by the pricing agreement. The case is before the Court on Defendant's Motion for Summary Judgment [39] and Plaintiff's Motion for Leave to File a Very Short Response with Brief in Support [63].[1]

## I. Background

Keeping in mind that, when deciding a motion for summary judgment, the Court "must view the evidence and all factual inferences in the light most favorable to the party opposing the motion," the Court provides a general statement of facts. *See Reynolds v. Bridgestone/Firestone, Inc.,* 989 F.2d 465, 469 (11th Cir.1993). This statement does not represent actual findings of fact and is presented simply to place the Court's legal anal-

1. The Court grants Plaintiff's Motion for Leave to File a Very Short Response with Brief in Support.

ysis within the context of a specific case or controversy.

Plaintiff is a closely-held Georgia corporation that up until 1994, sold carpets at its store, Baker's Carpet Gallery, in Tunnel Hill, Georgia. Fieldcrest Cannon, Inc. ("Fieldcrest") manufactures and distributes Karastan-brand carpets through its Carpet and Rug Division ("Karastan Division"). Plaintiff and Fieldcrest entered into an agreement ("exclusivity agreement") that named Plaintiff as the sole authorized dealer for Karastan-brand carpets in the Dalton, Georgia, market.[2] (Aff. of Terry Baker ¶ 3.) Fieldcrest continued this relationship with Plaintiff until July 30, 1993.

On July 30, 1993, Defendant Mohawk Industries, Inc., purchased the principal assets of the Karastan division from Fieldcrest. (*See* Dep. of William Storey on September 26, 1994 ("Storey Dep. 1") at 62–63.) Defendant continued the exclusivity agreement with Plaintiff until Defendant terminated the exclusivity agreement on September 1, 1993. (*See id.* at 62–63, 72–73; Dep. of William Qualls Ex. 11.)

### A. Business Operations of Fieldcrest Cannon, Inc.

At all times relevant to this action, the Karastan division operated as a distinct business unit within Fieldcrest. (Storey Dep. 1 at 62–63.) During this period, Fieldcrest maintained an exclusive distribution system for Karastan carpets, allowing only authorized dealers such as Plaintiff to sell the carpets to the public. (Dep. of William Storey on March 30, 1995 ("Storey Dep. 1") at 44.) Fieldcrest believed this exclusive dealership system fostered an image of top-of-the-line quality and superior consumer recognition for the Karastan brand. (*Id.*)

Fieldcrest also instituted a policy that prohibited "transshipping," or "selling to dealers who are not authorized Karastan dealers." (Qualls Dep.Ex. 6.) On January 18, 1991,

Fieldcrest sent a letter to its authorized Karastan dealers, including Plaintiff, warning that "should a Karastan dealer sell any Karastan product to a non-Karastan dealer, our business with that Karastan dealer will be terminated. This policy will be applied consistently to all dealers, and we urge you to view this announcement seriously." (*Id.*)

Since at least 1991, Fieldcrest published manufacturer's suggested retail prices and suggested promotional prices for its Karastan carpets. (Dep. of Dennis Thiets at 16–17, 36–39.) The suggested promotional prices reflected a 40 percent discount off the suggested retail prices. (*Id.*) In 1992, Fieldcrest announced a "deep discounting" policy, forbidding authorized dealers from selling Karastan products at prices lower than 10 percent below the suggested promotional prices. (Qualls Dep.Ex. 7.) Fieldcrest warned Karastan dealers that a violation of the deep discounting policy would result in termination of the dealer's exclusivity agreement. (*Id.*)

### B. Formation of an Alleged Resale Price Maintenance Agreement Between Plaintiff and Fieldcrest in 1991

In November or December 1991, Philip Haney, Fieldcrest's national vice president for sales for the Karastan division, investigated allegations that Plaintiff had violated Fieldcrest's transshipping policy. (Dep. of Philip Haney at 196–201.) Fieldcrest dispatched two Karastan division representatives to Plaintiff's store, where they presented Plaintiff's co-owner, Terry Baker, with a letter terminating the exclusivity agreement with Plaintiff. (Dep. of Terry Baker at 153–155.) Baker immediately telephoned Haney and adamantly denied that the transaction in question constituted transshipping, and Haney agreed to review the transaction records

---

**2.** The parties never reduced the terms of the exclusivity agreement to a single writing. (*See*

Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment at 6.)

and reconsider the decision to terminate the exclusivity agreement. (*Id.* at 155–78.)

Some time later, Haney telephoned Baker and informed him that the transaction "certainly [did not raise] a transshipping issue, but I do have a problem with the price."[3] (Baker Dep. at 173.) Haney "suggested that [Baker] need[ed] to do something about [Plaintiff's] pricing ... [and] suggested that [Plaintiff] get [its] prices up." (*Id.* at 173–74.) In the meantime, Haney said, the decision whether to terminate Plaintiff's exclusivity agreement would remain "on hold." (*Id.* at 174.)

Later in the week, Haney again telephoned Baker and reiterated that Haney "would like for [Baker] to raise [Plaintiff's] prices in general." (*Id.* at 175.) Baker responded that raising prices "was going to cost [Plaintiff] a lot of business. And [Haney] said, 'Well, the way it had to be was that from now on ... [Plaintiff] was not to price anything on the phone at less than 10 percent below the promotional price.'" (*Id.*) Additionally, Haney "asked again that [Baker] raise [Plaintiff's] in-store prices." (*Id.*)

Before ending the telephone conversation, Haney "made it very clear to [Baker] that if [Plaintiff] sold one piece of Karastan carpet on the phone at below 10 percent less than the promotional price, [Plaintiff] would be cut off." (Baker Dep. at 176–77.) Baker promised that he would "live up" to Haney's demand. (*Id.*)

John Eggleston, Fieldcrest's regional vice president for the Karastan division, confirmed the existence of a pricing agreement between Plaintiff and Fieldcrest. (Eggleston Dep. at 74.) Eggleston testified that Plaintiff's prices "had to stay within the guide—after reinstatement or after [Plaintiff] had been approved to retain the line, ... there were certain rules that had to be followed

and those rules were that [Plaintiff] had to maintain the suggested retail pricing." (*Id.*)

Following Baker's conversations with Haney, Plaintiff conformed to Fieldcrest's pricing requirements for telephone sales. (*Id.* at 177, 192–96.) Baker printed new price sheets to reflect the minimum prices for telephone sales, and Baker instructed Plaintiff's salespeople to adhere to the minimum prices. (Baker Dep. at 113–14, 121–24; Dep. of Dennis Hammontree at 18–21.) On several occasions, Fieldcrest employees monitored Plaintiff's prices by telephoning Plaintiff's store and requesting a price quotation. (Dep. of Greg Watkins at 42–44.) After Plaintiff implemented the new pricing policy, Plaintiff's sales volume fell by as much as $750,000. (Baker Dep. at 179.)

## C. Allegations of Transshipping and Pricing Violations in 1993

On April 5, 1993, Plaintiff sold 90 square yards of Karastan carpet for $1,260 to Robert Kenemer, a resident of Dalton, Georgia. (Dep. of Robert Kenemer at 11–18.) As a result of this transaction ("Kenemer transaction"), a Karastan dealer in Kansas City, Missouri, alleged that Plaintiff transshipped a Karastan carpet, in violation of the exclusivity agreement. (Thiets Dep. at 184–85.) The Kansas City dealer, and subsequently Fieldcrest's Karastan division executives, believed Plaintiff had sold the carpet over the telephone and then shipped the carpet directly to an unauthorized dealer in Kansas City. (*See* Thiets Dep. at 192–93 & Ex. 33; Haney Dep.Ex. 34.)

On July 13, 1993, Dennis Thiets, Fieldcrest's midwest regional vice president for the Karastan division, prepared a memorandum that recited the dealer's allegations and concluded, "[I]n addition to the transshipments, I think it is very special that they are selling the product at $14 per square yard and our promotional price is $19.95 carpet only." (Thiets Dep.Ex. 33.) Thiets forward-

---

3. Defendant vigorously disputes Baker's deposition testimony as to the time, form, and content of this conversation. However, when deciding a motion for summary judgment, the Court "must view the evidence and all factual inferences in the light most favorable to the party opposing the motion." *Reynolds,* 989 F.2d at 469.

ed his memorandum to Philip Haney, who now served as Fieldcrest's regional vice president for the Karastan division,[4] and William Storey, Fieldcrest's director of marketing for the Karastan division. (*Id.*)

On or about July 13, 1993, Haney prepared a memorandum to his files concerning the Kenemer transaction. (Haney Dep.Ex. 34.) The memorandum states that a "second" problem arising from the Kenemer transaction is that "selling the merchandise at [$14 per square yard] is very much a violation of our deep discounting policy." (*Id.*) Haney did not share this memorandum with any of the Karastan division employees, but he discussed the Kenemer transaction with Storey.[5]

### D. Defendant's Purchase of the Karastan Division and Alleged Perpetuation of the Resale Price Maintenance Agreement

On July 30, 1993, Defendant purchased the assets of the Karastan division from Fieldcrest. Defendant did not integrate the Karastan division into its overall operations. (Storey Dep. 1 at 61–63, 72–73.) Instead, the Karastan division continued to operate as a distinct business unit, with Defendant managing the Karastan operation "as a separate function from a sales and marketing aspect." (*Id.*) Defendant did not make any significant changes to the Karastan division's sales and marketing operations. (*Id.*) Most of Fieldcrest's Karastan division executives simply relocated to identical positions under Defendant's employment. (*Id.* at 70.) Defendant did not alter any of the Karastan division's policies with its authorized dealers, including the policies that governed pricing and transshipping. (*Id.* at 85–88.) Until Defendant published a revised set of policies in December 1993, the guidelines established by Fieldcrest in 1991 and 1992 remained the authoritative source of Defendant's policies for authorized Karastan dealers. (*Id.* at 89–90.)

### E. Defendant's Termination of the Exclusivity Agreement With Plaintiff

On September 1, 1993, Storey—at that time employed by Defendant—sent Plaintiff a letter terminating the exclusivity agreement. (Qualls Dep.Ex. 11.) The letter states that the decision to terminate the exclusivity agreement is based on Defendant's belief that the Kenemer transaction violated Defendant's transshipping policy. (*Id.*) After receiving Storey's letter, Baker telephoned Storey on several occasions and attempted to persuade Storey that the Kenemer transaction did not violate Defendant's transshipping policy. (Baker Dep. at 222–226.) Baker also mailed Storey a copy of the invoice and receipt involved in the Kenemer transaction as well as a letter detailing Plaintiff's version of the Kenemer transaction. (Storey Dep. Ex. 80.) During one of these telephone conversations, Storey told Baker that "if [Plaintiff] had sold it at the price it should have been sold, then it wouldn't have been a problem." (Baker Dep. at 235.) Baker subsequently spoke to Haney—then an employee of Defendant—regarding the termination letter, and Haney told Baker that Plaintiff's "price was below the level that it should have been." (*Id.* at 238.) Defendant did not reconsider its decision to terminate the exclusivity agreement.

### F. Procedural History

In early 1994, Plaintiff ceased operations. On May 12, 1994, Plaintiff filed suit in this Court alleging that Defendant violated the Sherman Act. On November 21, 1994, Plaintiff filed an Amended Complaint, adding Fieldcrest as a defendant. Plaintiff subsequently settled its claim with Fieldcrest, leaving only Plaintiff's claim against Defendant.

### II. Defendant's Liability Under Successor Liability Theories for the Actions of Fieldcrest Prior to Defendant's Purchase of the Karastan Division

█ Plaintiff alleges that in 1991, Fieldcrest forced Plaintiff to enter into a resale

---

4. At the time of the 1991 transshipping allegation, Philip Haney was national vice president for sales for the Karastan division, and he served as the supervisor of Plaintiff's Karastan account. *See* page 1468 *infra.*

5. Once again, Defendant strongly disputes the content, as well as the significance, of the conversation between Storey and Haney, which took place prior to the termination of Defendant's

price maintenance agreement in violation of the Sherman Act. Defendant's involvement in this agreement arose in 1993, when Defendant purchased the assets of the Karastan Division from Fieldcrest. Nonetheless, Plaintiff contends that successor liability operates to hold Defendant liable for antitrust violations that occurred both before and after Defendant purchased the Karastan Division in 1993. To support this conclusion, Plaintiff relies on the fact that Defendant maintained the Karastan Division's corporate structure to a substantial degree from which Plaintiff concludes Defendant necessarily assumed liability for antitrust violations the division may have committed while owned by Fieldcrest. Defendant counters that the general rules of successor liability foreclose Defendant's liability for any antitrust violations that occurred prior to its purchase of the Karastan division on July 30, 1993.

■ As a general rule, "a corporation that purchases or otherwise acquires the assets of a second corporation does not assume the debts and liabilities of the second corporation." *Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1456 (11th Cir.1985). The doctrine of successor liability recognizes four traditional exceptions to this general rule, allowing a court to impose liability upon the successor corporation. *Id.* One such exception applies when the successor corporation is a "mere continuation" or reincarnation of the selling corporation.[6] *Id.* Plaintiff does not argue that Defendant fits within the "mere continuation" exception,[7] but instead relies on a broadened test of successorship,

"substantial continuity," that has evolved from the "mere continuation" exception. *See United States v. Mexico Feed & Seed Co., Inc.*, 980 F.2d 478, 487 (8th Cir.1992).

The "substantial continuity" exception originated from a line of Supreme Court labor relations cases, starting with *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973). *See Mexico Feed & Seed*, 980 F.2d at 487–88. Since *Golden State Bottling*, the exception has been applied in the context of products liability and federal environmental regulation, where "the public policy vindicated by recovery from the implicated assets is paramount to that supported by traditional rules delimiting successor liability." *See Mexico Feed & Seed*, 980 F.2d at 487–88 (CERCLA); *Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145 (1st Cir.1974) (products liability). Although the test for the "substantial continuity" exception varies in different jurisdictions, the test typically considers:

whether the purchaser retained the same facilities, same employees, same name, same production facilities in the same location, same supervisory personnel; and produced the same product; maintained a continuity in assets; continued the same general business operation; and held itself out to the public as a continuation of the previous enterprise.

*Mexico Feed & Seed*, 980 F.2d at 488 n. 10.[8]

To the Court's knowledge, no court has applied the "substantial continuity" exception to assign liability to a successor corporation in the context of an antitrust claim.[9] The Eleventh Circuit, while adopting the "sub-

exclusivity agreement with Plaintiff. See *supra* note 3.

6. Plaintiff does not allege that any of the three remaining exceptions are applicable, including (1) express or implied agreement to assume liability for the alleged resale price maintenance agreement; (2) the existence of a "de facto" merger between Defendant and Fieldcrest; and (3) fraud in the transaction so that Fieldcrest can avoid liability for its conduct. *See Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1456 (11th Cir.1985).

7. "The key element of a '[mere] continuation' is a common identity of the officers, directors, and stockholders in the selling and purchasing corpo-

rations." *Bud Antle*, 758 F.2d at 1459. Employment of the selling business entity's officers by the successor corporation is not enough—there must be a transfer of stock. *Id.* at 1458–59. Plaintiff has adduced no evidence revealing a transfer of stock from Fieldcrest to Defendant, and therefore cannot rely on the "mere continuation" exception to support its claim.

8. In citing this form of the test, the Court does not suggest that the form is superior to others adopted in other jurisdictions.

9. As discussed below, the court in *In Re Master Key Antitrust* applied the "continuity of enterprise" test, which some courts have described as identical to the "substantial continuity" exception. *See Anderson v. City of Minnetonka*, 1993

**1472**

stantial continuity" exception in the context of labor law, *see Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1567 (11th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994), is silent on the prospect of employing the exception in an antitrust action.

Courts adopting the "substantial continuity" exception have identified four policies that justify its use. First, and most important, is the need to prevent a responsible party from evading a federal statute's remedial purpose simply through the creative structuring of subsequent transactions. *See, e.g., Mexico Feed & Seed*, 980 F.2d at 488 (CERCLA); *Cyr*, 501 F.2d at 1153–54 (products liability). Second, the "substantial continuity" exception furthers a national interest in uniform enforcement of federal statutes, "command[ing] that ... successor liability be governed by a uniform federal rule of decision rather than by the laws of the individual states." *See Atlantic Richfield Co. v. Blosenski*, 847 F.Supp. 1261, 1283 (E.D.Pa.1994) (CERCLA). Third, is the need to realize the stated intent of the "substantial continuity" exception assists courts in achieving Congress' intent in enacting broad remedial statutes. *See id.* at 1285 (citing a memorandum issued by the Environmental Protection Agency that expressly adopted the position that a successor corporation is liable for the acts of a predecessor under the "substantial continuity" exception).

The fourth and final policy justification behind the "substantial continuity" exception is highlighted in a Third Circuit opinion in which the court refused to adopt the exception in the context of strict products liability.[10] In *Polius v. Clark Equipment Co.*, 802 F.2d 75 (3d Cir.1986), the court found the exception to be "an unsound exception to the general rule" that an asset purchaser does not acquire the seller's liabilities. 802 F.2d at 75. The court expressed concern that the exception "brush[es] aside the bedrock requirement" of a causal relationship between a defendant's acts and a plaintiff's injury, thus imposing liability "on entities which in fact had no connection with the acts causing inju-

ry." *Id.* at 81. A district court, following *Polius,* found the "substantial continuity" exception more appropriate in environmental cases involving CERCLA, where liability is imposed even in the absence of a causal link between the defendant and the harm. *See Atlantic Richfield*, 847 F.Supp. at 1285–87 (citing *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir.1985) (finding causation requirement to be incompatible with the basic structure of CERCLA's definition of responsible parties)). Following the reasoning of the Third Circuit courts, the Court concludes that the fourth policy favoring use of the "substantial continuity" exception is the need to eliminate a causation requirement to establish liability under the statute in question.

Applying these four policies to the facts of this case, the Court declines to adopt the "substantial continuity" exception as a necessary means of achieving the policies and objectives of antitrust law.

First, adoption of the "substantial continuity" exception is not necessary to prevent either Fieldcrest or Defendant from evading the remedial purposes of the Sherman Act. Defendant is undoubtedly liable for any violations of antitrust laws committed after it purchased the Karastan division. 15 U.S.C.A. § 1 *et seq.* Likewise, the sale of the Karastan division left undisturbed Fieldcrest's liability for antitrust violations that occurred before Fieldcrest sold the division. *See, e.g., United States v. Gold*, 743 F.2d 800, 822 (11th Cir.1984) (corporation is liable for acts or omissions of its agents, performed in the scope of the agents' employment), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985). Arguably, a selling company could evade antitrust liability by selling the company's entire assets and subsequently dissolving. However, such a scenario already is addressed by the "de facto merger" exception to successor liability, which applies when "the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically pos-

WL 95361, at *7 (D.Minn. January 27, 1993) (unpublished).

**10.** Several courts presented with the opportunity to adopt the "substantial continuity" exception

have declined to do so. *See, e.g., Florom v. Elliott Mfg.*, 867 F.2d 570, 579 (10th Cir.1989); *Hoover v. Recreation Equipment Corp.*, 792 F.Supp. 1484, 1495 (N.D.Ohio 1991) (both products liability cases).

sible." *Bud Antle,* 758 F.2d at 1458. Any debate whether the "de facto merger" exception adequately prevents evasion of antitrust laws is academic at any rate, because in this case the selling corporation continues to exist; indeed, Plaintiff litigated its antitrust claim against Fieldcrest, resulting in a settlement of $162,500. For these reasons, Plaintiff has "not shown that application of the traditional mere continuation exception, [as opposed to the "substantial continuity" exception], would frustrate [the statute's] remedial purposes in this case." *See Sylvester Bros. Development Co. v. Burlington Northern R.R.,* 772 F.Supp. 443, 449 (D.Minn. 1990).

Second, the "substantial continuity" exception is not required to achieve uniform enforcement of the Sherman Act on a nationwide level. Most jurisdictions recognize only the four traditional exceptions to the general rule on limited successor liability, while relatively few courts have adopted the broader "substantial continuity" exception in contexts that do not include antitrust law. *See Bud Antle,* 758 F.2d at 1456; *Mexico Feed & Seed,* 980 F.2d at 487. The courts that have addressed successor liability in an antitrust context have relied only on the four traditional exceptions. *See, e.g., State v. Louis Trauth Dairy, Inc.,* 1996 WL 343440, at *5–6 (S.D. Ohio April 25, 1996) (granting summary judgment to successor corporation); *In Re Catfish Antitrust Litigation,* 908 F.Supp. 400, 412 (N.D.Miss.1995).

Plaintiff cites *In Re Master Key Antitrust Litigation,* 1977–1 Trade Cases ¶ 61,456, 1976 WL 1377 (D.Conn. Sept. 28, 1976), as an example of a court that adopted the "substantial continuity" exception in an antitrust case. The Court reads *In Re Master Key* differently. Although the *In Re Master Key* court states that it applies a "continuity of enterprise" test—used by several courts as a synonym for the "substantial continuity" exception—the factors considered by the court suggest that it applied the same traditional exceptions as the courts in *Louis Trauth Dairy* and *In Re Catfish. Id.* Specifically, the court noted that the shareholders of the selling company acquired stock in the buying company, thus fulfilling the primary requirement of the "mere continuation" exception—from which the "substantial continuity" exception arises. *See Bud Antle,* 758 F.2d at 1458–59. To the extent that *In Re Master Key* suggests the adoption of a broader test than the "mere continuation" exception, the Court disagrees with this outcome.

Third, the antitrust statutes and regulations do not reveal an intent to broaden traditional forms of successor liability. *See* 15 U.S.C.A. §§ 7, 12 (1973) (defining "person" held liable under the Sherman Act to include a "corporation" but providing no further guidance). Plaintiff has not pointed to, nor has the Court been able to uncover, any regulation or statement by Congress or the Federal Trade Commission that evinces an intent to adopt a broader theory of successor liability. *Cf. Atlantic Richfield,* 847 F.Supp. at 1285 (citing EPA memorandum that advocates adoption of exception identical to "substantial continuity" exception). The Court therefore concludes that adoption of the "substantial continuity" exception is not necessary to comply with the stated objectives and intent underlying the Sherman Act.

Fourth, unlike CERCLA, the Sherman Act retains traditional causation as an element of a defendant's liability. *Foremost–McKesson, Inc. v. Instrumentation Laboratory, Inc.,* 527 F.2d 417, 418 (5th Cir.1976) ("The necessity for proof of causation in a private antitrust action is ... clear."). Comparatively, "Congress specifically rejected including a causation requirement in [CERCLA's definition of responsible parties]." *Atlantic Richfield,* 847 F.Supp. at 1285. The elimination of this requirement in CERCLA led the Third Circuit to apply the "substantial continuity" exception to CERCLA actions, while the court rejected the use of the exception in products liability actions, where a causal link is "fundamental" to recovery. *Id.*

Antitrust law is more akin to products liability law in retaining a causation requirement. Consequently the "substantial continuity" exception is tendency to "brush aside" this "bedrock" requirement of causation renders inappropriate the application of the exception to antitrust cases. *See Polius,* 802 F.2d at 81.

**1474**

In sum, the Court declines to adopt the "substantial continuity" exception, and instead recognizes only the four traditional exceptions of successor liability within the context of this antitrust case. Because Plaintiff has not alleged that Defendant's purchase of the Karastan division falls within any of the traditional exceptions, summary judgment is appropriate with respect to conduct that is alleged to have occurred prior to July 30, 1993.

## III. Summary Judgment

### A. Admissibility of Testimony by Terry Baker as to Statements by Defendant's and Fieldcrest's Employees

■ When evaluating a motion for summary judgment, the Court may consider only evidence that is admissible at trial. *Sires v. Luke,* 544 F.Supp. 1155, 1160 (S.D.Ga.1982) (citing *Samuels v. Doctors Hosp., Inc.,* 588 F.2d 485, 486 & n. 2 (5th Cir.1979)). Testimony as to an out-of-court statement by a nonparty is inadmissible hearsay, and therefore cannot be considered by the Court when assessing the suitability of summary judgment. *Id.*

The primary evidence adduced by Plaintiff in opposing Defendant's Motion for Summary Judgment involves out-of-court statements by the employees of Defendant and Fieldcrest. Specifically, Plaintiff relies on:

(1) testimony by Plaintiff's co-owner, Terry Baker, that describes statements made in 1991 by Fieldcrest employees Philip Haney, John Eggleston, and William Qualls, concerning the 1991 transshipping allegations and the resale price maintenance agreement;

(2) conversations between Fieldcrest employees Dennis Thiets, Philip Haney, and William Storey, in which the 1993 transshipping allegations are reviewed;

(3) memoranda prepared on or about July 14, 1993, by Fieldcrest employees Dennis Thiets and Philip Haney, concerning the 1993 transshipping allegations; and

(4) testimony by Terry Baker detailing statements made in 1993 by Defendant's employees Philip Haney and William Storey, concerning the 1993 transshipping allegations and the termination of Plaintiff's exclusivity agreement.

Defendant objects to the admissibility of this evidence, arguing only that Plaintiff has not adduced sufficient independent evidence to allow the out-of-court statements to be admitted within the co-conspirator exception to the hearsay rule. Fed.R.Evid. 104, 801(d)(2)(E). Defendant's objection fails for four reasons.

■ First, statements made by Karastan division executives after Defendant purchased the Karastan division on July 30, 1993, are admissible as admissions by a party opponent. Fed.R.Evid. 801(d)(2)(D). Defendant employed Philip Haney and William Storey at the time they made their statements to Baker, and the statements concerned a matter within the scope of their employment. Therefore, the statements are not hearsay under the Federal Rules of Evidence. *Id.*

■ Second, the statements by Fieldcrest employees Haney, Qualls, and Eggleston, involving the 1991 transshipping allegations, directly relate to Plaintiff's claim that these employees imposed and enforced a resale price maintenance agreement. As such, the statements are admissible as possessing independent legal significance, because they reveal the offer and acceptance necessary to establish the existence of the pricing agreement. *See Kepner–Tregoe, Inc. v. Leadership Software, Inc.,* 12 F.3d 527, 540 (5th Cir.) ("A contract is a verbal act ... [and] has legal reality independent of the truth of any statement contained in it."), *cert. denied,* —— U.S. ——, 115 S.Ct. 82, 130 L.Ed.2d 35 (1994); *Hydrite Chemical Co. v. Calumet Lubricants Co.,* 47 F.3d 887, 892 (7th Cir.1995) ("It is direct evidence, not hearsay, when a party to a dispute over a contract testifies to the offer or the acceptance made by the other contracting party."). The statements also establish the alleged use of threats of termination by Fieldcrest employees in order to secure Plaintiff's adherence to the resale price maintenance agreement. The statements thus

possess independent legal significance to show the existence of such threats.

■ Alternatively, Baker's testimony concerning the 1991 statements by Haney, Qualls, and Eggleston is admissible to demonstrate the effect of these statements on the listener. *See United States v. Cruz*, 805 F.2d 1464, 1477 (11th ·Cir.1986), *cert. denied*, 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 204 (1987). "[E]xcluded from the hearsay rule is verbal or nonverbal 'conduct when it is offered as a basis for inferring something *other* than the matter asserted.'" *Id.* (emphasis in original) (quoting *Lubbock Feed Lots v. Iowa Beef Processors, Inc.*, 630 F.2d 250 (5th Cir. 1980)). Plaintiff intends to support its antitrust claim by showing that, after hearing the 1991 statements of Haney, Qualls, and Eggleston, Plaintiff understood that it must raise its prices to avoid termination of the exclusivity agreement. Indeed, Plaintiff supports this claim with price sheets, printed by Plaintiff soon after these conversations took place, that reflect a new category of higher prices. For these reasons, Plaintiff may testify as to the statements to show the effect of the statements on Plaintiff's decision to raise its prices.

■ Third, Plaintiff seeks to introduce memoranda prepared by Philip Haney and Dennis Thiets while they were employed by Fieldcrest. Because the memoranda were prepared during the course of and in furtherance of the common objectives of the alleged resale price maintenance agreement, the memoranda are admissible as statements made by a co-conspirator. Fed. R.Evid. 801(d)(2)(E). In order to admit evidence under the co-conspirator exception, the Eleventh Circuit requires Plaintiff to adduce sufficient evidence, "independent of the co-conspirator statement itself," to establish both the conspiracy and the declarant's participation in the conspiracy. *United States v. James*, 590 F.2d 575, 581 (5th Cir.), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). The Court concludes that the statements made by the employees of Fieldcrest and Defendant, which already are admissible as discussed above, fulfill the "more likely than not" standard of proof required to establish Haney and Thiets's participation in a price-fixing conspiracy. *See Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987). The memoranda, therefore, are admissible.

■ Fourth, Plaintiff seeks to introduce evidence concerning conversations between Fieldcrest employees Haney, Thiets, and William Storey that took place at approximately the same time as the preparation of the Thiets and Haney memoranda. Testimony as to the existence of these conversations is admissible because the evidence is not introduced to establish the truth of the assertions made in the conversations. Rather, the evidence simply shows the conversations actually took place, and thus lead to an inference that the speakers had the opportunity to exchange information regarding Plaintiff's alleged failure to comply with the resale price maintenance agreement. As a result, the evidence is not hearsay.

Accordingly, the Court concludes that Baker's testimony as described above is admissible without offending the rule against hearsay evidence. In addition, the memoranda prepared by Philip Haney and Dennis Thiets, as well as conversations between Haney, Thiets, and William Storey concerning these memoranda, also are admissible.

## B. Summary Judgment Standard for an Antitrust Claim Involving a Dealer Terminated Pursuant to an Illegal Price–Fixing Scheme

As a general rule, the party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Helicopter Support Systems v. Hughes Helicopter*, 818 F.2d 1530, 1534 (11th Cir.1987). The moving party's burden is discharged by "'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In as-

sessing whether the movant has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Reynolds v. Bridgestone/Firestone, Inc.,* 989 F.2d 465, 469 (11th Cir.1993). Once the moving party has adequately supported its motion, the nonmovant has the burden of showing summary judgment is improper by coming forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Dunnivant v. Bi–State Auto Parts,* 851 F.2d 1575, 1579 (11th Cir.1988).[11]

The Eleventh Circuit has formulated a specialized test to assess, at the summary judgment stage, a dealer's claims of wrongful termination by a manufacturer acting pursuant to an illegal resale price maintenance agreement. *Helicopter,* 818 F.2d at 1534 (creating the *"Helicopter* test"); *see, e.g., DeLong Equipment Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499, 1508–09 (11th Cir.1989) (*"DeLong II"*) (applying the *Helicopter* test), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990). The *Helicopter* test provides that, in order to survive a defendant's properly supported motion for summary judgment, the plaintiff must adduce facts that tend to show (1) a conspiracy to set prices existed, and (2) the plaintiff was terminated pursuant to that conspiracy. *See DeLong II,* 887 F.2d at 1508. To satisfy the first part of the *Helicopter* test, the plaintiff must (A) point to "evidence which tends to exclude the possibility that the manufacturer was operating independently in making his determination to terminate the distributor"; and (B) "satisfy the court that the conspiracy which he alleges is, objectively, an economically reasonable one." *Helicopter,* 818 F.2d at 1534. Sub-part A is satisfied if the plaintiff shows (i) the manu-

facturer sought an agreement from the dealer to adhere to resale prices; and (ii) the dealer communicated in some way its acquiescence in that agreement. *Id.* at 1533.

In addition to creating the specialized *Helicopter* test, courts have modified slightly the general summary judgment standard for antitrust violations involving resale price maintenance agreements. *Helicopter,* 818 F.2d at 1532 (citing *Monsanto v. Spray–Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)). Consequently, antitrust plaintiffs face a heavy standard when opposing a properly supported motion for summary judgment, because courts are limited in the "range of permissible inferences" that can be made from "ambiguous" evidence. *DeLong II,* 887 F.2d at 1508. Evidence is ambiguous if it is equally consistent with a finding of permissible competition as it is with a finding of illegal conspiracy. *Helicopter,* 818 F.2d at 1533. Without additional direct or circumstantial evidence, ambiguous evidence alone cannot support an inference of conspiracy. *Id.* As a result, a conclusory statement by the plaintiff that a conspiracy existed, without more, does not support "even an inference of conspiracy" and cannot survive a motion for summary judgment. *Dunnivant,* 851 F.2d at 1579.

Despite this heightened standard, *Monsanto* and its progeny "cannot be read to change the general rule that reasonable inferences from the evidence must be taken in favor of the nonmoving party." *Helicopter,* 818 F.2d at 1535. The plaintiff's evidence "need not be such that *only* an inference of conspiracy may be derived from it. It must, however, go beyond equivocal complaints and *tend* to exclude the inference of independent action." *Id.* at 1534 n. 4. Once reasonable inferences are taken in favor of the nonmoving party, the "stringent

---

**11.** Notwithstanding the clarity of these general rules, Plaintiff and Defendant have done an admirable job of pinpointing a tendency toward inconsistency in courts' assessment of summary judgment motions in antitrust cases:

"The Supreme Court ... has articulated specific rules which make summary judgment more readily available in cases alleging violations of section 1 of the Sherman Act." *De-*

*Long Equipment Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499, 1505 (11th Cir.1989), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990).

"[S]ummary judgment should be used cautiously in antitrust cases." *Dunnivant v. Bi–State Auto Parts,* 851 F.2d 1575, 1584 (11th Cir.1989).

standard of proof" in vertical restraint cases must be satisfied. *Id.* at 1535. Thus, allegations by the plaintiff that are not merely conclusory, but rather can serve as direct evidence if believed, are sufficient to defeat a summary judgment motion. *See id.* at 1534 n. 4.

## C. Application of the *Helicopter* Test

■ Defendant contends that Plaintiff's evidence does not satisfy the *Helicopter* test. More specifically, Defendant asserts that the evidence has been distorted in Plaintiff's "makeshift blender in the hopes that it can be pureed into something this Court can swallow." (Defendant's Reply Brief in Support of its Motion for Summary Judgment at 2.) After carefully chewing on Defendant's argument, the Court disagrees, finding sufficient morsels of evidence to allow the Court to digest the facts in such a way as to satiate the *Helicopter* test.

### 1. Plaintiff's Showing that a Conspiracy to Set Prices Existed

Plaintiff's first step in satisfying the *Helicopter* test is to show the existence of a conspiracy to violate the Sherman Act. *Helicopter Support Systems v. Hughes Helicopter,* 818 F.2d 1530, 1533–34 (11th Cir.1987). In *Monsanto Co. v. Spray–Rite Service Corp,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the Court set forth a test for assessing whether Plaintiff's evidence establishes an agreement to restrain trade in a dealer termination case:

> [T]here must be evidence that tends to exclude the possibility of independent action by the manufacturer and distributor. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.

465 U.S. at 768, 104 S.Ct. at 1473. In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court added a second requirement, assigning Plaintiff the burden of showing that the alleged conspiracy is, objectively, a reasonable one. 475 U.S. at 588, 106 S.Ct. at 1356–57.

As directed by the *Helicopter* test, the Court will consider the *Monsanto* and *Matsushita* requirements in turn. Following this analysis, the Court will assess whether the evidence supports an inference that Defendant perpetuated the alleged conspiracy after it purchased the Karastan division from Fieldcrest on July 30, 1993.

### A. Evidence Which Tends to Exclude the Possibility That Defendant Was Operating Independently

Under the *Helicopter* test, evidence tends to exclude the possibility that the manufacturer was acting independently if it shows (i) the manufacturer sought an agreement from its dealer to adhere to a resale price, and (ii) the dealer in some way communicated its acquiescence in the proposed agreement. *Helicopter,* 818 F.2d at 1533.

### (i) Evidence that Defendant Illegally Sought an Agreement From Plaintiff to Adhere to a Resale Price

■ A manufacturer may announce in advance the terms under which it will sell its products, and may refuse to deal with those customers who do not comply with the terms. *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). However, when the manufacturer's actions "go beyond mere announcements of his policy and the simple refusal to deal, and he employs other means which effect adherence to his resale prices," the resulting agreement is a *per se* violation of Section 1 of the Sherman Act. *United States v. Parke, Davis & Co.,* 362 U.S. 29, 44, 80 S.Ct. 503, 511–12, 4 L.Ed.2d 505 (1960); 15 U.S.C.A. § 1. Included in "other means" are threats of termination and other coercive actions taken after a dealer fails to conform to a manufacturer's predetermined prices. *See, e.g., Monsanto,* 465 U.S. at 765–767, 104 S.Ct. at 1471–72.

■ Several circuit court cases illustrate this principle. In *Bender v. Southland Corp.,* 749 F.2d 1205 (6th Cir.1984), the court distinguished illegal coercion from permissible suggestion and persuasion. 749 F.2d at 1213. Coercion is impermissible when it reflects "actual or threatened affirmative ac-

tion, beyond suggestion or persuasion, taken by a defendant in order to induce a plaintiff to follow the defendants' prices." *Id.* More specifically, threats of terminating a franchisee in order to induce compliance with predetermined retail prices constitute illegal coercion. *Yentsch v. Texaco, Inc.,* 630 F.2d 46, 53 (2d Cir.1980); *see also Carlson Machine Tools, Inc. v. American Tool, Inc.,* 678 F.2d 1253, 1261 (5th Cir.1982) (threatening to make a "meaningful event depend on compliance or non-compliance" with a pricing agreement is coercion).

Plaintiff has adduced direct and circumstantial evidence of threatening behavior by Karastan division employees that reveals an intent to seek an agreement to maintain the resale prices for Karastan products. As owner of the Karastan division in 1991, Fieldcrest published manufacturer's suggested retail and promotional prices for Karastan products. Under the *Colgate* rule, this conduct alone is not improper. However, Philip Haney, Fieldcrest's national vice president for sales for the Karastan division, expressly warned Plaintiff's owner, Terry Baker, that "the way it had to be was that from now on ... [Plaintiff] was not to price anything on the phone at less than 10 percent below the promotional price." (Baker Dep. at 174.) Haney then "made it very clear to [Baker] that if [Plaintiff] sold one piece of Karastan carpet on the phone at below 10 percent less than the promotional price, [Plaintiff] would be cut off." *(Id.* at 176–77.) This evidence of coercion is even more compelling in light of the fact that Haney's warning came immediately after Fieldcrest's agents accused Plaintiff of violating its pricing policies and delivered a letter terminating Plaintiff's exclusivity agreement. At the time of Haney's threats, Plaintiff's termination was "on hold" and under reconsideration by Fieldcrest.

This direct evidence, offered through the testimony of Terry Baker, is corroborated by the testimony of John Eggleston, regional vice president of the Karastan division, and William Qualls, manager of the Karastan territory in which Plaintiff was located. Both Eggleston and Qualls admitted that they were dispatched to deliver to Plaintiff a letter terminating the exclusivity agreement. Eggleston stated that, following this episode, he understood that Plaintiff must not sell Karastan products below the predetermined prices. Finally, Plaintiff subsequently published a revised price list and instructed its salespeople to adhere to the new prices, and Fieldcrest's employees even monitored Plaintiff's price quotations on the telephone.

Plaintiff's evidence comprises more than merely conclusory complaints that Fieldcrest's employees sought an illegal pricing agreement. Indeed, Plaintiff has adduced direct evidence that Fieldcrest employees threatened to terminate Plaintiff's contractual right to sell Karastan products if Plaintiff did not agree to sell Karastan products at a predetermined price level. Plaintiff also has adduced circumstantial evidence, such as revised price sheets and price monitoring by Fieldcrest's employees, that supports the inference that Fieldcrest sought the agreement through such threats. As such, Fieldcrest's conduct is identical to the threatening behavior found illegal by the *Yentsch* and *Bender* courts.

Defendant argues that Plaintiff's evidence is offered solely through the testimony of Terry Baker, while Defendant's own evidence contradicts Baker's testimony. Defendant contends that Plaintiff's evidence therefore falls within the definition of "ambiguous" evidence and cannot, by itself, defeat Defendant's Motion of Summary Judgment. *(See* Defendant's Memorandum of Law in Support of Summary Judgment at 20–21.) The Court disagrees. Evidence is ambiguous if, notwithstanding its source, it is equally consistent with a finding of permissible competition as it is with a finding of illegal conspiracy. *Helicopter,* 818 F.2d at 1533. Evidence is not ambiguous solely because it is offered through the testimony of Plaintiff's owner, nor is evidence ambiguous simply because Defendant's own testimony contradicts it. "[T]he court must look beyond the defendant's bald denial of concerted action and analyze the substance of [the plaintiff's] evidence in order to determine if summary judgment is appropriate." *DeLong Equipment Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499, 1515 (11th Cir.1989) ("*DeLong II* "), *cert. denied,* 494 U.S. 1081, 110 S.Ct.

1813, 108 L.Ed.2d 943 (1990). Looking at the substance of Plaintiff's evidence, the Court believes that Baker's testimony, when considered alongside testimony by Field-crest's employees and other circumstantial evidence, tends to show that Fieldcrest sought, through illegally coercive means, to establish an agreement with Plaintiff to maintain resale prices for Karastan products.

#### (ii) Evidence That Plaintiff Acquiesced in an Agreement With Defendant to Adhere to a Resale Price

Under *Helicopter*, the second step for a plaintiff to exclude the possibility that the manufacturer acted independently is to show that the plaintiff in some way communicated its acquiescence in the manufacturer's proposed agreement to adhere to predetermined resale prices. *Helicopter*, 818 F.2d at 1533–34. To discharge this requirement, the evidence must reveal

> a "meeting of the minds in an unlawful arrangement ... [which] includes more than a showing that the distributor conformed to the resale price. It means as well that evidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer"

*Monsanto*, 465 U.S. at 764, 764 n. 9, 104 S.Ct. at 1470–71, 1471 n. 9.

Plaintiff's evidence shows that Terry Baker told Philip Haney that Plaintiff would "live up" to Haney's demands that Plaintiff adhere to the pricing agreement. Moreover, Haney's telephone statements to Baker reveal that Haney sought this kind of assurance from Plaintiff. The Court believes that a reasonable inference from this evidence is that Haney sought Plaintiff's acquiescence in a pricing agreement, and that Baker communicated Plaintiff's acquiescence to Haney.

The Court therefore concludes that Plaintiff has presented evidence that tends to exclude the possibility that Fieldcrest and Plaintiff acted independently. The Court now turns to the second part of Plaintiff's required showing of the existence of a conspiracy: whether the alleged conspiracy is, objectively, an economically reasonable one.

#### B. Whether the Alleged Conspiracy Is Economically Reasonable

In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court held that if the alleged price-fixing conspiracy is "economically irrational and practically infeasible, then summary judgment should be granted." *Helicopter*, 818 F.2d at 1534 (applying the *Matsushita* test). This requirement does not "introduce a special burden on plaintiffs facing summary judgment in antitrust cases," but rather permits summary judgment if the inferences arising from the plaintiff's evidence are so unreasonable as to be "economically senseless." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 468, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992).

In *Helicopter*, a manufacturer terminated a dealer based on the dealer's noncompliance with a resale price maintenance agreement. Applying the *Matsushita* test, the court found the agreement was "a perfectly feasible and sensible undertaking. By exerting control over the resale prices of its distributors, [the manufacturer and its dealers] would hope to reap monopoly profits arising from a collusively inflated market price." 818 F.2d at 1534. Plaintiff's evidence reveals facts nearly identical to those considered by the *Helicopter* court. Defendant terminated the exclusivity agreement with Plaintiff allegedly because Plaintiff failed to adhere to predetermined resale prices. Following the reasoning of the *Helicopter* court, the Court concludes that the conspiracy alleged by Plaintiff is economically rational and practically feasible.

As discussed above, Plaintiff's evidence also allows a reasonable inference that Fieldcrest sought and established an illegal conspiracy with Plaintiff to fix prices for Karastan products. Plaintiff thus has satisfied all the subparts of the first prong of the *Helicopter* test.

#### 2. Whether Plaintiff's Evidence Supports an Inference that Defendant Adopted and Perpetuated an Alleged Conspiracy to Fix Prices

The Court believes Plaintiff has adduced sufficient evidence to create a genuine dis-

pute whether Defendant adopted and perpetuated the price-fixing conspiracy with Plaintiff after Defendant purchased the Karastan division on July 30, 1993. After Defendant purchased the Karastan division from Fieldcrest, the division continued to operate as a distinct business unit. Defendant did not make any significant changes to the division's sales and marketing operations, and it retained the same executive personnel. More importantly, Defendant did not alter any of the Karastan division's policies with its authorized dealers, including the pricing policies. Defendant simply adopted the guidelines published by Fieldcrest in 1991 and 1992 as the source of Defendant's policies for dealers such as Plaintiff. Additionally, Karastan's executives continued to enforce the pricing agreement after the Defendant purchased the division. Therefore, the Court concludes that Plaintiff's evidence is sufficient to withstand summary judgment regarding an agreement between Plaintiff and Defendant to maintain a predetermined resale price for Karastan products.

**3. Plaintiff's Showing that Defendant Terminated the Exclusivity Agreement Pursuant to the Alleged Conspiracy to Fix Prices**

The second prong of the *Helicopter* test requires Plaintiff to adduce evidence showing Plaintiff was terminated pursuant to the alleged conspiracy. *See DeLong Equipment Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499, 1508 (11th Cir.1989) ("*DeLong II*"), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990). The *Colgate* doctrine arises once again in this context, because a manufacturer may refuse to sell its goods to anyone, even if the refusal is based on a dealer's failure to adhere to suggested resale prices. *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). A manufacturer's refusal to deal, however, is illegal under the Sherman Act if performed pursuant to a price-fixing conspiracy between the manufacturer and its dealer. *Monsanto Co. v. Spray–Rite Service Co.,* 465 U.S. 752, 768, 104 S.Ct. 1464, 1472–73, 79 L.Ed.2d 775 (1984). In order to establish a violation of the Sherman Act in this context, Plaintiff must present direct or circumstantial evidence that supports a reasonable inference that a causal connection exists between the termination and the alleged conspiracy. *Id.* at 765–68, 104 S.Ct. at 1471–73.

In *Monsanto,* the Court affirmed a jury verdict based on largely circumstantial evidence establishing a causal connection between the termination of a herbicide dealership and an illegal price-fixing conspiracy. *Id.* at 768, 104 S.Ct. at 1472–73. The Court relied on testimony that, at a meeting between agents of the manufacturer and the dealer, the first topic raised by the manufacturer's agent was the prices charged by the dealer for the herbicide. *Id.* at 767, 104 S.Ct. at 1472. In addition, the Court cited testimony that, prior to the termination, the manufacturer never discussed with the dealer the criteria that served as the alleged basis for the termination. *Id.* Finally, the Court referred to testimony by the dealer's president that the manufacturer's officers made explicit threats to terminate the dealership unless the dealership raised its prices. *Id.* at 768, 104 S.Ct. at 1472–73.

The Eleventh Circuit considered a similar set of facts in *DeLong II.* 887 F.2d at 1514–15. Relying almost exclusively on circumstantial evidence, the court found that genuine issues of material fact existed regarding the cause of the dealer's termination. *Id.* The court observed that, to counter the dealer's circumstantial evidence, the manufacturer may argue that a valid business reason served as the motivation behind terminating the dealer. *Id.* However, the dealer may respond to such arguments by showing the manufacturer's justifications are merely pretextual: "While such evidence standing alone would not be sufficient to show joint action in violation of the antitrust laws, '[e]vidence of pretext, if believed by a jury, would disprove the likelihood of independent action on the part of [the defendant].'" *Id.* at 1514 (quoting *Fragale & Sons Beverage Co. v. Dill,* 760 F.2d 469, 474 (3d Cir.1985)).

The evidence in this case presents a striking similarity to that considered by the *Monsanto* and *DeLong II* courts. First, immediately after terminating the exclusivity agreement, William Storey, Defendant's di-

rector of marketing for the Karastan division, told Plaintiff's owner, Terry Baker, that "if [Plaintiff] had sold it at the price it should have been, then it wouldn't have been a problem." (Baker Dep. at 235.) In addition, Philip Haney, Defendant's regional vice president for the Karastan division, told Baker that Plaintiff's "price was below the level it should have been." Finally, two memoranda expressly refer to Plaintiff's failure to adhere to the predetermined resale price. Storey received one of these memoranda, and discussed the transaction in question with the author of the other, before terminating the exclusivity agreement with Plaintiff.

Defendant endeavors to minimize the significance of this evidence by alleging that a valid business reason motivated its decision to terminate the exclusivity agreement. Specifically, Defendant argues that Plaintiff violated Defendant's prohibition against transshipping. Plaintiff's evidence, however, suggests that Defendant's stated reason for terminating the exclusivity agreement is merely pretextual. In October 1993, only one month after Defendant terminated the exclusivity agreement with Plaintiff, Defendant did not terminate another dealer that transshipped carpet to a non-authorized dealer. (Storey Dep. 2 at 211–19, Ex. 68, 69.) Moreover, the two memoranda discussing Plaintiff's transshipping violation expressly mention the resale price violation.

Defendant attempts to discredit Plaintiff's evidence by pointing to deposition testimony by William Storey, suggesting that Plaintiff misinterpreted Storey's telephone statement to Baker: "Storey maintains that he told Baker that but for Plaintiff's pricing, dealers would not have been interested in purchasing carpets from [Plaintiff] which in turn would have prevented a transshipping violation." (Defendant's Memorandum in Support of its Motion for Summary Judgment at 20–21.) Defendant contends that Storey's testimony renders Plaintiff's evidence ambiguous and insufficient to withstand summary judgment.

■ Defendant once again has misapprehended the definition of "ambiguous" evidence. *See Helicopter*, 818 F.2d at 1533 (ambiguous evidence is equally consistent with a finding of illegal conspiracy as a finding of permissible competition). Testimony that is merely contradicted by conflicting testimony from an adverse party is not automatically rendered ambiguous. As *Monsanto* states, when the manufacturer disputes the dealer's testimony, "the choice between two reasonable interpretations of the testimony properly [is] left for the jury." 465 U.S. at 767 n. 12, 104 S.Ct. at 1472 n. 12. The Court must look "beyond the defendant's bald denial of concerted action and analyze the substance of [the plaintiff's] evidence." *DeLong II*, 887 F.2d at 1515.

Finally, Defendant argues that, before deciding to terminate the exclusivity agreement, Storey never discussed the resale price violation with any other employee. Unfortunately for Defendant, the *DeLong II* court dismissed an identical argument as "unpersuasive," because "conspiracies are rarely evidenced by explicit agreements, and must almost always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators." 887 F.2d at 1515.

The Court thus concludes that Plaintiff has adduced sufficient direct and circumstantial evidence to support an inference that Defendant terminated Plaintiff's exclusivity agreement because of an illegal conspiracy to fix prices, and not because of a violation of the transshipping policy. As a result, Plaintiff's evidence satisfies the second prong of the *Helicopter* test.

**D. Plaintiff's Evidence of Antitrust Injury**

■ Even if the Court concludes that Defendant participated in an illegal resale price maintenance agreement, Plaintiff still must demonstrate that Plaintiff has suffered antitrust injury. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342, 110 S.Ct. 1884, 1893–94, 109 L.Ed.2d 333 (1990) (holding that even in cases that involve conduct that is illegal *per se*, plaintiff must allege and prove antitrust injury). The Eleventh Circuit has held that a plaintiff can suffer antitrust injury simply by losing its dealership and consequently losing sales and profits. *DeLong Equipment Co. v. Washing-*

**1482**

*ton Mills Electro Minerals Corp.*, 990 F.2d 1186, 1199 (11th Cir.) ("*DeLong III*"), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993). In *DeLong III,* the defendant manufactured a particular brand of "media" that possessed certain competitive advantages over other market alternatives. *Id.* The court found that the plaintiff, upon being terminated as a supplier of the defendant's media, did not suffer "damage simply from its own failure to compete in the open market for identical media made by other manufacturers." *Id.* Rather, the plaintiff "was not allowed to participate in the competitive market for [the defendant's] media because it refused to go along with the [defendant's] price-fixing scheme." *Id.* Consequently, the plaintiff suffered antitrust injury. *Id.*

The Fifth Circuit also has held that wrongful termination of a dealership can constitute antitrust injury. *Pierce v. Ramsey Winch,* 753 F.2d 416, 435 (5th Cir.1985). "[T]he *sina qua non* of the injury caused by a refusal to deal [is the] inability to obtain the product. From this failure to obtain the product would flow subsidiary consequences: loss of sales or market share because of the failure to sell or utilize this product." *Id.* A jury question on the issue of damages, therefore, can be established "simply by showing that, following termination, plaintiff, because he lacked the terminating manufacturer's product, suffered a decline in gross sales." *Id.* at 435–36.

Plaintiff has introduced evidence that the termination of its dealership caused the closing of its business and resulted in lost profits. (Second Amended Report of Bruce Seaman at 5–8, Ex. E, F, G.) Furthermore, Defendant's Motion for Summary Judgment ignores the possibility that Plaintiff could have suffered antitrust injury, based solely on the existence of a resale price maintenance agreement, during the period in which Defendant allegedly perpetuated this agreement. Thus, Plaintiff has created a jury question sufficient to survive summary judgment on the issue of antitrust injury.

## IV. Conclusion

ACCORDINGLY, the Court **GRANTS IN PART** Defendant's Motion for Summary Judgment [39] with respect to claims arising from alleged antitrust violations that occurred prior to July 30, 1993, and **DENIES IN PART** Defendant's Motion with respect to claims arising from alleged antitrust violations that occurred after July 30, 1993. The Court also **GRANTS** Plaintiff's Motion for Leave to File a Very Short Response With Brief in Support [63].

IT IS SO ORDERED.