HELICOPTER SUPPORT SYSTEMS, INC., Plaintiff-Appellant,

George W. Hurd, et al., Plaintiffs,

v.

HUGHES HELICOPTER, INC., Defendant-Appellee,

George W. Hurd, et al., Defendants,

Helicopter Leasing Services, Inc., and Charles W. Brammer, Defendants-Appellees.

No. 85–3938.

United States Court of Appeals, Eleventh Circuit.

June 12, 1987.

H. Kenneth Kudon, Washington, D.C., for plaintiff-appellant.

Steven D. Merryday, Glenn, Rasmussen, Fogarty, Merryday & Russo, Tampa, Fla., for defendant-appellee.

Before ANDERSON and CLARK, Circuit Judges, and SIMPSON *, Senior Circuit Judge.

ANDERSON, Circuit Judge:

Helicopter Support Systems, Inc. ("HSS") appeals from the district court's order granting summary judgment to appellee Hughes Helicopter, Inc. ("Hughes"). Because we find that HSS has adduced evidence which tends to exclude the possibility that Hughes was acting independently, we reverse.

## I. BACKGROUND

Hughes is an international manufacturer of helicopters, helicopter parts and related items. These products are distributed through service centers and distributors in the United States and overseas. HSS, located in Florida, was a franchised Hughes service center from September 1978 through April 1983.

As part of its operation, HSS advertised parts sales and support services for Hughes helicopters throughout the world. Frequently, such advertisements offered a significant discount on Hughes parts. HSS was successful with such advertising, and

---

* Judge Simpson did not participate in the decision of this case and the decision is by quorum.

28 U.S.C. § 46; Circuit Rule 3.

overseas sales became a significant portion of HSS' business.

HSS' distributorship for Hughes was ultimately terminated. HSS contends that this termination was pursuant to a resale price support agreement between Hughes and its international distributors. In other words, HSS argues that it was terminated because it undersold other Hughes distributors in the sale of Hughes parts overseas. As evidence of this price support agreement, HSS points to various communications between Hughes and its international distributors, and to Hughes' international distributorship agreement which, allegedly, provides for a resale price fixing arrangement.

Hughes, of course, tells a different story. According to Hughes, HSS was terminated because it provided inadequate service to local Florida customers. In support of its contention, Hughes adduced evidence to show that HSS moved its repair facility to a more distant location, failed to employ a Hughes qualified mechanic, and had difficult business relations with local law enforcement officials who were major Hughes customers.

■ Following its termination, HSS brought suit in district court. HSS alleged that Hughes was involved in a price fixing conspiracy with its overseas distributors in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The district court granted summary judgment to Hughes.[1] This appeal ensued.

## II. DISCUSSION

Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, proscribes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." Because of the unusual nature of § 1 antitrust violations which involve an allegation that a manufacturer has acted in concert with the distributors of its product in order to fix illegally a resale price, the Supreme Court has recently crafted a revised standard of proof for such cases. This case presents the first opportunity for this circuit to apply that standard.[2]

### A. Summary Judgment Standard

Generally an order granting summary judgment may be entered only when the moving party has met the burden of demonstrating the absence of a genuine issue of material fact, viewing the evidence in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Morrison v. Washington County*, 700 F.2d 678, 682 (11th Cir.), *cert. denied*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). All reasonable doubts regarding the facts should be resolved in favor of the non-moving party. Moreover, a court must deny summary judgment if reasonable minds could differ as to the factual inferences to be drawn from the undisputed facts.

Two recent Supreme Court cases, however, modify this general summary judgment standard for antitrust violations arising out of allegations that a distributor was terminated because it failed to adhere to an illegal resale price agreement.

In *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the Court reviewed a manufacturer's termination of a price-cutting distributor after the manufacturer had received complaints from another distribu-

---

1. The parties are agreed that all other claims have been dismissed with prejudice. Consequently, they have waived any technical requirement that a separate document be filed entering judgment as to those claims. The separate document requirement of Fed.R.Civ.P. 58 may be waived by the parties. *Bankers Trust Co. v. Mallis*, 435 U.S. 381, 385–86, 98 S.Ct. 1117, 1120–21, 55 L.Ed.2d 357 (1978). Thus, the district court's order is a final judgment and this court has jurisdiction to adjudicate the appeal.

2. Whatever this legal standard might be, an appellate court must independently review the district court's order granting summary judgment. *Thrasher v. State Farm Fire & Casualty Co.*, 734 F.2d 637, 638 (11th Cir.1984). We are not bound by the district court's initial determination.

tor. The Court held that these complaints were not, standing alone, sufficient to create a jury question as to whether the manufacturer and the distributor had agreed to an illegal resale price support mechanism. This standard might seem to fly in the face of the general rule of *Adickes*, since it is at least arguable that a jury might reasonably infer such an agreement from the existence of complaints by a distributor and a manufacturer's response to those complaints by terminating the offending distributor.

■ The ruling in *Monsanto* is understandable in light of the distinction between permissible independent or unilateral conduct and impermissible concerted action. Under *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), it is permissible for a manufacturer to announce retail prices in advance and terminate all distributors who fail to comply. Thus, a manufacturer's termination of a price-cutting distributor after receiving a complaint from another distributor is lawful under *Colgate* if it is the product of an independent determination that the price-cutting distributor undermined the manufacturer's legitimate marketing plans.

■ By contrast, in *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), the Supreme Court held that it was impermissible for a manufacturer and its distributors to agree on the price at which distributors would resell goods.[3] *Monsanto* holds, however, that in order to establish liability under the doctrine of *Dr. Miles*, more evidence is needed of impermissible behavior than a mere response to distributor complaints. Such a response is equally consistent with the distributor's permissible exercise of its rights under *Colgate*. The Court thus declined to adopt an evidentiary rule which would extensively deter permissible, economically advantageous conduct.

Consequently, *Monsanto* requires that, in order to avoid summary judgment, "[t]here must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." 104 S.Ct. at 1471. Such evidence will exist if the manufacturer seeks agreement from its distributor to conform to a resale price and if the distributor communicates in some way its acquiesence in that agreement. *Id.* at 1471 n. 9. In short, *Monsanto* establishes that conduct which is as equally consistent with permissible competition as it is with an illegal conspiracy does not, without more, support even an inference of conspiracy. *Id.* at 1470. If other evidence of a conspiracy is not available then the plaintiff has failed to prove an essential element of an antitrust case and summary judgment against him is proper. *Cf. Celotex Corp. v. Catrett*, — U.S. —, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Subsequent to *Monsanto*, the Supreme Court decided *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *Matsushita* added a gloss to the *Monsanto* test which is also relevant here. American electronics manufacturers alleged that their Japanese competitors had conspired to monopolize the American markets through predatory pricing below market level. The Supreme Court reversed the Third Circuit's denial of a motion for summary judgment, reasoning that "the factual context renders [the American companies'] claim [an] implausible ... one that simply makes no economic sense." 106 S.Ct. at 1356. Thus, the Court held that a non-moving party who seeks to defeat a summary judgment motion "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that

---

**3.** Such agreements are per se illegal, though many have suggested that they ought instead to be subject to the antitrust rule of reason. *See, e.g., Business Electronics v. Sharp Electronics Corp.*, 780 F.2d 1212, 1221 (5th Cir.1986) (Jones, J., concurring). Though there is a strong argument that there is no social benefit in subjecting manufacturer's pricing relationships with their

distributors to per se illegality where they operate in markets whose interbrand competitiveness overwhelms any detrimental effects of those relationships, we are bound by the Supreme Court's continuing adherence to a rule of per se illegality. *Monsanto*, 104 S.Ct. at 1469 n. 7.

could not have harmed" them. *Id.* at 1357. If the alleged conspiracy is economically irrational and practically infeasible, then summary judgment should be granted. Following this test the Supreme Court determined that the twenty-year price-cutting conspiracy in the United States allegedly conducted by Japanese electronics manufacturers was economically infeasible. Hence, the American manufacturers' antitrust claim could not survive a summary judgment motion.

■ We discern from these cases a two-step test which an antitrust plaintiff must survive in order to avoid summary judgment when he alleges a conspiracy that arises out of a collusive price-fixing agreement between a manufacturer and its distributors. First, the plaintiff must satisfy the court that the conspiracy which he alleges is, objectively, an economically reasonable one. *Matsushita* dictates that if the alleged conspiracy is economically infeasible or irrational then, as a matter of law, summary judgment must be entered against the plaintiff. Second, the plaintiff in a distributor-termination case must also be able to point to evidence which tends to exclude the possibility that the manufacturer was operating independently in making his determination to terminate the distributor. Mere complaints from other competing distributors are not sufficient in this regard since they are equally consistent with both an independent and a collusive interpretation. The distributor must, instead, adduce positive evidence which tends to exclude the possibility of unilateral action.[4]

### B. *Application of the Standard*

Though we have defined a stringent summary judgment test for terminated distributors in antitrust cases, the district court nonetheless erred in its determination that HSS could not survive a summary judgment motion against it. Our review of the record makes it clear that HSS has both alleged an economically reasonable conspir-

acy, and adduced evidence which tends to exclude the possibility that Hughes was acting independently.

The economic rationality of the alleged conspiracy was not addressed by the district court. Yet, even a cursory examination reveals that HSS' evidence meets this requirement. In *Matsushita*, the alleged conspiracy was deemed economically irrational because it required a long-term predatory pricing policy in order to be effective. In other words, the alleged *Matsushita* conspirators must have agreed to sustain lost income for a period of over twenty years in the hopes of thereafter reaping monopoly profits. Plainly, such a conspiracy is an economically infeasible one.

■ By contrast, in the instant case, HSS alleges a perfectly feasible and "sensible" undertaking. By exerting control over the resale prices of its distributors, Hughes, and the distributors, would hope to reap monopoly profits arising from a collusively inflated market price. Rather than being deferred to some time in the future, the increased profits would immediately benefit Hughes and its distributors. Moreover, if unity were maintained, no competitor could enter the market and offer a more competitive pricing arrangement because Hughes is, in most instances, the sole source of parts for its helicopters. Thus, the conspiracy alleged is plainly a rational one.

■ The more difficult question is posed by the second prong of the test. The district court concluded that HSS had not been able to point to any evidence which tended to exclude the possibility that Hughes was engaged in a unilateral effort to fix resale prices with its distributors. The district court concluded that the evidence adduced by HSS amounted to nothing more than mere complaints from overseas distributors.

We think that the district court underestimated the evidence favorable to HSS and misapplied the dictates of *Monsanto.*

---

**4.** This evidence need not be such that *only* an inference of conspiracy may be derived from it. It must, however, go beyond equivocal com-

plaints and *tend* to exclude the inference of independent action.

*Monsanto* cannot be read to change the general rule that reasonable inferences from the evidence must be taken in favor of the non-moving party. Once reasonable inferences are taken in favor of the non-moving party, the stringent standard of proof—presentation of evidence which tends to exclude the possibility of independent action—must be satisfied. *Matsushita,* 106 S.Ct. at 1355–57. Thus, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* at 1357; *see also Monsanto,* 104 S.Ct. at 1471 (in determining whether there was sufficient evidence to create a jury issue, the Court employed the general rule: "there was sufficient evidence for the jury reasonably to have concluded that Monsanto and some of its distributors were parties to an 'agreement' or 'conspiracy' to maintain resale prices"); *Business Electronics Corp. v. Sharp Electronics Corp.,* 780 F.2d 1212, 1219 (5th Cir.1986) (same).

We conclude that the evidence discussed by the district court plus other evidence revealed in our review of the record gives rise to a reasonable inference of a collusive agreement to fix resale prices. This evidence, amounting to more than mere complaints, would, if credited by the trier of fact, tend to exclude the possibility that Hughes was acting independently.[5] HSS has presented "direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme to achieve an unlawful objective.'" *Monsanto,* 104 S.Ct. at 1471 (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir.1980), *cert. denied,*

451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)).

The district court reviewed a series of communications between Hughes and one of its overseas distributors and determined that these reflected nothing more than mere complaints. The district court's analysis, however, did not give full credit to the reasonable inferences which might have been drawn from the communications. The first telex from Derek Graham, Hughes' English distributor, to George Hurd, a Hughes executive, simply copies one of HSS' overseas discount price fliers and indeed amounted to nothing more than a mere complaint about HSS' pricing policy. *See* Exh. C. Tab 2. Thereafter, however, Hurd replied: "Please be advised that corrective action has been taken regarding the U.S. service center offering discounted parts on the international market. Hopefully, the problem is resolved but should it recur please advise us." *Id.* Finally, Graham responded: "Thank you for your prompt action in respect of the pirate spares supplier." *Id.*

These communications reflect something more than mere complaints. There was not merely a complaint and corrective action. In addition, Hughes advised Graham that corrective action has been taken and requested that Graham report any future violation. A jury could reasonably infer that this constituted an assurance to Graham by Hughes that it would similarly correct any future violations that Graham might report. Graham's "thank you" response creates a reasonable inference of Graham's agreement to report future violations.

We need not decide, however, whether the foregoing evidence would be sufficient by itself to satisfy the stringent test,[6] be-

---

**5.** It is, of course, not our duty to make an authoritative determination of Hughes' liability; that will be for the trier of fact in the first instance. All we need to determine at this juncture is that a reasonable trier of fact might conclude from the evidence presently before us that Hughes and its overseas distributors had engaged in an impermissible antitrust conspiracy. *Cf. Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (motion for summary judgment implicates substantive evidentiary standard and permits court

to weigh evidence only to determine if genuine issue for trial exists).

**6.** However, the Supreme Court in *Monsanto* indicated that such evidence was precisely what was required:

There must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently. As Judge Aldisert has written, the antitrust plaintiff should present direct or cir-

cause the record in this case includes direct evidence of an agreement between Hughes and its foreign distributors to maintain resale prices. The district court overlooked documentary evidence—Hughes' international distributorship agreement, see Exh. D at 1446—which tends to exclude the possibility that Hughes was acting independently.[7] Paragraph C.10 of that agreement provides that, for international distributors, the "suggested price lists and schedule of discounts may be amended, altered, or modified from time to time, and as so altered, amended or modified, will be binding on Distributor upon notification in writing." Id. at 1460. Facially, this provision indicates that the distributor and Hughes have agreed to fixed resale prices for Hughes parts overseas. Hughes seeks to explain this provision by suggesting that it fixes the wholesale price at which a distributor must buy parts from Hughes rather than fixing the price at which the distributor must resell them. Such explanation is implausible[8] at worst, and at best, a reasonable trier of fact might disagree and draw from this agreement the inference that Hughes and its overseas distributors had agreed to fix resale prices in violation of the antitrust laws. Cf. Reborn Enterprises, Inc. v. Fine Child, Inc., 590 F.Supp. 1423, 1439 (S.D.N.Y.1984) (evidence of adherence to fixed resale price absent agreement with manufacturer insufficient to avoid summary judgment), affirmed, 754 F.2d 1072 (2d Cir.1985).[9]

We conclude that a jury might reasonably infer from the foregoing evidence that Hughes and its overseas distributors had an ongoing agreement to maintain overseas resale prices and that, pursuant to that agreement, Hughes terminated HSS for discounting prices below the agreed resale prices.[10]

---

cumstantial evidence that reasonably tends to prove that the manufacturer and others "had a conscious commitment to a common scheme designed to achieve an unlawful objective." Edward J. Sweeney & Sons, supra, at 111 ... cf. American Tobacco Co. v. United States, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946) (Circumstances must reveal "a unity of purpose or common design in understanding, or a meeting of minds in an unlawful arrangement"). [fn 9]

9. The concept of "a meeting of the minds" or "a common scheme" in a distributor-termination case includes more than a showing that the distributor conformed to the suggested price. It means as well that evidence must be presented both that the distributor communicated its acquiesence or agreement, and that this was sought by the manufacturer.
Monsanto, 104 S.Ct. at 1471.

7. Of course, an agreement to fix resale prices in a foreign market may not, under some circumstances violate the antitrust laws. See Export Trading Company Act of 1982, 15 U.S.C. §§ 4001, et seq.; Webb-Pomerene Act, 15 U.S.C. § 62. Hughes has not argued, however, that either the ETCA or Webb-Pomerene Act provides it any protection in this case. Cf. United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 206–07, 89 S.Ct. 361, 365–66, 21 L.Ed.2d 344 (1968).

8. Hughes' interpretation is somewhat implausible. A "suggested price list" sounds more like a resale price list. Hughes would have no need to "suggest" the wholesale price at which it would sell parts; it would simply set such prices.

Moreover, ¶ A.5 of that same agreement incorporates a complicated mechanism for calculating the distributor's wholesale price for parts. If ¶ C.10 had the meaning which Hughes attributes to it, then it is simply redundant. Indeed, we note that while ¶ A.5 has an equivalent in the domestic service center agreement, ¶ C.10 does not.

9. The district court also relied upon the one-year delay which occurred between the receipt of the distributor's complaints and Hughes' termination of HSS. The district court determined that the time lag between Graham's complaint and HSS' termination negated any inference that Graham and Hughes were not acting independently. See Record on Appeal, vol. 7, tab 161 at 3–4. This conclusion flies directly in the face of binding Supreme Court precedent. In Monsanto, the Supreme Court acknowledged that there had been no complaints for a period of fifteen months prior to termination. It reasoned, nonetheless, that it was "permissible for the jury to conclude that there were complaints during [the intervening fifteen months]," Monsanto, 104 S.Ct. at 1473 n. 14. In this case there is similar evidence from which a jury could infer continued complaints. If fifteen months is not sufficient to bar the inference of continuing complaints, then surely the mere lapse of a year may not defeat the inference of continuing communication between a manufacturer and its distributors.

10. We have not detailed the evidence of causation in text because there was ample evidence which, if credited by the jury, would support a determination that HSS' was terminated be-

## III. CONCLUSION

In light of the foregoing analysis, the district court erred in granting summary judgment to Hughes. HSS has proffered evidence from which inferences can be drawn that tend to exclude the possibility that Hughes was acting independently when it terminated HSS. Consequently, the decision of the district court is reversed and the case is remanded for further proceedings.

REVERSED and REMANDED.

cause of its discounting. In brief this evidence includes: (1) evidence of threats to terminate HSS for its discounting policies; (2) evidence of a direct request by Hughes that HSS stop its foreign discounting; (3) evidence that a new service center was placed in Florida in contravention of general Hughes policy as a retaliation for HSS' continued discounting; and (4) evidence that Hughes' asserted grounds for terminating HSS were pretextual.