[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-10813

_____

D.C. Docket No. 1:16-cv-03595-MLB

AMERICAN CONTRACTORS SUPPLY, LLC,

Plaintiff-Appellant,

versus

HD SUPPLY CONSTRUCTION SUPPLY, LTD.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 4, 2021)

Before ROSENBAUM, LAGOA, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

This appeal requires us to determine whether Plaintiff-Appellant American Contractors Supply, LLC ("ACS"), a distributor of tilt-wall equipment, presented evidence of facts tending to exclude the inference that a competing distributor and a manufacturer acted independently when the manufacturer terminated further business with ACS in the Florida market. ACS appeals the entry of summary judgment against it and in favor of the competitor distributor, Defendant-Appellee HD Supply Construction Supply, Ltd., known as "White Cap," on ACS's Sherman Antitrust Act and Georgia state law claims, all based on the theory that White Cap illegally conspired with the manufacturer, Meadow Burke. Because the evidence in this case is at least "as equally consistent with permissible competition as it is with an illegal conspiracy," Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc., 818 F.2d 1530, 1533 (11th Cir. 1987), we affirm.

## I.  BACKGROUND

### A. The Tilt Industry

ACS and White Cap are both distributors of equipment used in tilt concrete wall construction in the southeast. "Tilt" or "tilt wall" construction is a method of building concrete buildings: concrete walls are cast in panels on site, lifted into place with cranes, and linked together. ACS and White Cap distribute tilt products and equipment such as the cranes for lifting the wall panels and stilts to hold the panels up and in place during construction.

2

ACS and White Cap were competitors in the Georgia and Florida markets. In Georgia, there have been a total of three successful distributors of tilt-wall equipment: ACS, White Cap, and Construction Materials, a company not involved in this dispute. ACS distributed Meadow Burke-manufactured tilt products and equipment and enjoyed a 25% share of the Georgia market. White Cap had a market share of over 35%, and Construction Materials had a market share of about 40%.

In Florida, however, before 2016, only two main distributors operated: Construction Materials primarily distributed equipment from manufacturer Dayton Superior, and White Cap—with the largest presence in the state—nearly exclusively distributed Meadow Burke equipment. White Cap invested in the Meadow Burke brand in Florida by, for example, co-sponsoring events and employing over 100 employees with more than 10 years' experience with Meadow Burke products. In their respective levels in the market chain, White Cap had over a 75% share of the Florida market, and Meadow Burke had over a 65% share.

B. ACS's Entry into the Florida Market

ACS wanted to expand. The location it settled on was Florida, and the products it settled on were those from Meadow Burke—the manufacturer whose products ACS sold in Georgia but that only White Cap had sold in Florida. ACS has described Meadow Burke as a "superior product" when compared with the

3

other suppliers' products, hence its desire for expansion into Florida with Meadow Burke products.

ACS moved to make the entry into Florida happen by working with Mike Wolstenholme, Meadow Burke's Director of Tilt Up.[1]  ACS Chief Executive Officer Jason Reuter and General Manager Ron Barteski met with Wolstenholme at ACS's Atlanta, Georgia office on April 28, 2016, where the Florida expansion idea was discussed.   Wolstenholme told ACS that Meadow Burke would supply ACS with its products in the state if ACS opened an office in Tampa, Florida.

After this April meeting, ACS began its entry into the Florida market. Before establishing ACS's Florida office, Jason Reuter took steps to secure a bid with a contractor in Florida; on May 10, 2016, he communicated with contractor Flagship Tilt-Wall about bidding on its projects.  Meadow Burke's Wolstenholme had told Jason Reuter to proceed with the bid—for a project to be supplied by Meadow Burke—despite ACS not having yet opened its Florida office.   ACS says part of the reason it had the opportunity to bid on a Flagship project was because Flagship complained to Meadow Burke and White Cap that there was a lack of communication and coordination by White Cap.  In other words, ACS saw an

---

[1]    Wolstenholme also held the title of Northeast Regional Sales Manager.

opportunity, perceiving a competitor to be faltering and not fulfilling customer needs.

On June 22, 2016, Jason Reuter forwarded project drawings to Meadow Burke's engineering department to facilitate the Flagship bid. Around that same time, he updated Wolstenholme on the progress of ACS's development of a Tampa office. And on July 1, ACS opened the office.

On July 5, 2016, ACS won the Flagship bid, and ACS notified Meadow Burke. The Meadow Burke engineering department, which had already been working on the matter, prepared the bill of materials. White Cap then accidentally found out about ACS's winning the bid (with Meadow Burke products) for the Flagship project in Florida. Lori Dykes at Meadow Burke sent the bill of materials in an email to Christina Miller, an equipment rental coordinator at White Cap, an incident that White Cap describes as a clerical error. Miller forwarded the email to Doug Bartle of White Cap, the White Cap contact for Meadow Burke.

C. Alleged Anticompetitive Conduct

The fallout from the clerical error started when Doug Bartle felt "hurt" after seeing the bill of materials for a Meadow Burke-supplied project with ACS as the distributor. He left a voicemail for Meadow Burke's Lori Dykes and then had a thirteen-minute phone call with her. After the call, Dykes sent an email on July 13, 2016, to Meadow Burke's Wolstenholme and Greg Arnett, Meadow Burke's

Southern Regional Sales Manager, describing the call with the subject line "John House"; John House was the sales representative for Dayton Superior, another supplier of tilt equipment in Florida and Meadow Burke's primary competitor in Florida. The email, which ACS labels as a "smoking gun," read as follows:

> Hello Greg and Mike,
>
> I just talked to Bartle and WC is very upset and totally disappointed in MB! They can not believe we let someone else sell Tilt in FL nor can I! John [H]ouse[2] is flying in to meet with Doug[3] at [W]hite [C]ap tomorrow to discuss tilt for the Carolina area and I am sure Florida as well. We need damage control ASAP, it was brought up to upper management today during a meeting to discuss bringing in more braces and strong backs but that PO[4] is now on hold because letting someone else into Florida. Please confirm we will NO Longer allow anyone other than WC to sell Tilt in Florida. Please call to discuss how we can move forward and fix what we have done.
>
> Lori

After receiving the email, Arnett and Wolstenholme each proceeded to make phone calls. Arnett spoke internally with their immediate supervisor, Meadow Burke's Vice President of Sales Doug Crawford, about what had taken place. Wolstenholme had a conversation with Bartle of White Cap later on July 13,

---

[2]    "John House" is the sales representative for Dayton Superior.

[3]    "Doug" is Doug Bartle, the White Cap representative who coordinated with Meadow Burke.

[4]    "PO" is a "purchase order" from White Cap on another project that White Cap was putting on hold because of its concern about Meadow Burke's letting ACS sell the Meadow Burke product in Florida.

6

during which Bartle said that they needed to have a sit-down, face-to-face conversation.   Wolstenholme and Bartle agreed to a meeting in Tampa, which took place on July 25, 2016.   Wolstenholme also responded later that day, on July 13, to the email from Dykes, copying Arnett, saying, "I'm coming to meet them in person.  Not going to get things straight over the phone or on any damn emails." At some point, Arnett and Crawford met to discuss the issue, and Arnett and Wolstenholme had a follow-up conversation.

A week later, on July 20, 2016, Arnett emailed Crawford, stating, "Mike [Wolstenholme] and I have discussed the ACS/WC issue and we will not be supporting them in FL going forward."  Later that day and into the next, Crawford emailed the decision up the chain of command to Meadow Burke President Eoin Lehane, and the two had the following exchange:

> [Crawford:]  ACS will not be opened in FL.  Arnett and I discussed with Mike [Wolstenholme] and came to that conclusion.  Not as straight forward as initially thought and Mike had put a fair amount of thinking into his perspective, but Greg [Arnett] and I were against it and Mike is fine with our decision. . . .
>
> [Lehane:]  Good deal - glad Mike came to same conclusion. . . .
>
> [Crawford:]  The call was really mine and Greg's though Mike saw both sides from the beginning.  Mike ultimately needed us to be the scapegoats so he could tell his customer/ friend that the call wasn't his. . . .
>
> [Lehane:]  Sounds good - glad the call was made.  Hopefully Mike realizes not to do this again and not without proper consultation first.

7

A few days later, on July 25, 2016, Meadow Burke's Wolstenholme, Arnett, and Dykes met with White Cap's Bartle and its local managers at White Cap's Tampa, Florida offices. At the meeting, Meadow Burke "reassured" White Cap that apart from the single Flagship project already assigned to ACS, Meadow Burke was not going to support ACS in the Florida market.

Later that same day, Wolstenholme and Arnett met with ACS CEO Jason Reuter and his brother Jacob Reuter, another principal of ACS—both of whom were working out of ACS's new Tampa office. Wolstenholme told them that Meadow Burke was cutting ACS off in Florida. Wolstenholme acknowledged that they "wouldn't be sitting [at the meeting] if [they] didn't receive pressure." Notes from this meeting indicate that they discussed how Meadow Burke "owns" Florida and that ACS has four projects in the northeast but "nobody cares."

Later communications implemented the decision to terminate ACS. On August 10, 2016, Meadow Burke, through Wolstenholme, denied a request by ACS to bid on a new project. Then, sometime in August or September 2016, the president (also a co-owner) of Flagship—the company for whose project ACS had won its only Meadow Burke-supplied Florida bid—was told by Bartle that White Cap had the buying power to get Meadow Burke to cut off ACS in Florida, stating, "We sent him packing. We do millions a year with Meadow Burke." Finally, on

8

October 13 and 14, 2016, Wolstenholme and Arnett exchanged emails internally at Meadow Burke, referencing Meadow Burke and Bartle:

> Subject: Re: MB equipment orders for WC -S E . . .
>
> [Wolstenholme:]  . . . Mr. Bartle has issued several nice PO's for equipment going to the South East.  Do you know if these orders will fall under your guys when invoiced?  Just an FYI . . . Had a good talk with Doug – things will get interesting . . .
>
> [Arnett:] You drinking the kool aide? . . .
>
> [Wolstenholme:] Doug Bartle

D. Alleged Effects

During the summer of 2016 and through the summer of 2018, despite the lack of support from Meadow Burke in Florida, ACS operated from its new office in Tampa, but not without struggle.  Having stocked up on inventory and equipment and having made other investments for expansion in Florida, ACS decided to start working with another, newer manufacturer, SureBuilT, after losing out on Meadow Burke's business.   Despite this, ACS identified safety concerns with SureBuilT products, which ACS linked to the inability for ACS to reach a level of sales sufficient to scale up Florida operations.   ACS had at least nine projects supplied by SureBuilT.  ACS closed shop in Florida in late August and early September 2018, more than two years after learning of Meadow Burke's decision.

9

In addition to its own exit from the market, ACS attributes other market effects to the alleged anticompetitive conduct of White Cap.  ACS offers certain economic evidence paired with expert evidence, including evidence of increases in prices for certain products in the market and in White Cap's gross margins and market share in Florida.

E.  Procedural History

ACS filed suit in September 2016 against White Cap.[5]  ACS alleged four causes of action in its operative complaint that were all based on the same allegations of anticompetitive conduct—that White Cap and Meadow Burke conspired to terminate ACS.  The causes of action alleged by ACS are: (1) unreasonable restraint of trade in violation of section 1 of the Sherman Act, 15 U.S.C. §§ 1, 15; (2) monopolization and (3) attempted monopolization in violation of section 2 of the Sherman Act, id. §§ 2, 15; and (4) tortious interference with a business relationship in violation of Georgia law.

White Cap moved for summary judgment on all four claims, and ACS filed a motion for partial summary judgment on the issue of the relevant market for its Sherman Act claims.

After the motions were fully briefed, the district court granted summary judgment in favor of White Cap on all four of ACS's claims.  With respect to

---

[5]    Meadow Burke was not named as a defendant.

10

ACS's § 1 claim, the district court recognized that proof of concerted action was a prerequisite. The district court held that ACS had failed to adduce evidence creating a genuine issue of fact that White Cap and Meadow Burke had entered into a conspiracy (i.e., an agreement) for Meadow Burke to cease doing business with ACS in Florida. Thus, summary judgment was warranted. The district court also rejected ACS's § 2 claims, concluding that there was no anticompetitive conduct to form the basis for the § 2 claims. For the same reason, the district court rejected ACS's Georgia tortious interference claims, ACS having asserted to support that claim only antitrust violations as the necessary improper conduct without privilege. And because there was no violation of the antirust laws, ACS's partial motion for summary judgment on the relevant market for its § 2 claims was denied as moot.[6]

Judgment was entered, and ACS timely appealed.

## II. ANALYSIS

We review <u>de novo</u> a grant of summary judgment. <u>Cowen v. Ga. Sec'y of State</u>, 960 F.3d 1339, 1341 (11th Cir. 2020). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is

---

[6]    ACS does not challenge the district court's denial of its motion for partial summary judgment. We would reach the same conclusions as the district court, that the motion is moot, in light of our conclusion that ACS has failed to demonstrate any genuine issue of material fact on its antitrust claims.

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  We view the evidence in the light most favorable to the non-moving party.  Cowen, 960 F.3d at 1342.  "[T]his Court may affirm the judgment of the district court on any ground supported by the record, regardless of whether that ground was relied upon or even considered by the district court."  Kernel Records Oy v. Mosley, 694 F.3d 1294, 1309 (11th Cir. 2012).

ACS argues that summary judgment was erroneously granted because the evidence demonstrates that White Cap agreed with Meadow Burke to have Meadow Burke stop supplying ACS projects in Florida.  Because the antitrust law does not permit liability for conduct that is equally consistent with independent conduct as it is with concerted action, and because all of ACS's claims are based on the same theory of this agreement, we hold that ACS's evidence is deficient and summary judgment was properly granted.  We take each of ACS's claims in turn.

A. Section 1 Claim

Section 1 of the Sherman Antitrust Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 1.  "Despite the different terminology, there is no magic unique to each term" in § 1; the terms "contract," "combination," and "conspiracy" are used interchangeably to capture the concept of concerted action, that is an "agreement."  Tidmore Oil Co.

v. BP Oil Co./Gulf Prods. Div., a Div. of BP Oil Co., 932 F.2d 1384, 1388 (11th

Cir. 1991).  And in interpreting § 1, "the Supreme Court has long concluded that

Congress intended only to prohibit 'unreasonable' restraints on trade."  Quality

Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co., 917 F.3d 1249, 1260

(11th Cir. 2019) (en banc) (citing Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S.

332, 343, 102 S. Ct. 2466, 2472–73, 73 L. Ed. 2d 48 (1982)).  "Thus, § 1 prohibits

(1) conspiracies that (2) unreasonably (3) restrain interstate or foreign trade."  Id.

"The first inquiry, in any section 1 claim, then, is to locate the agreement that

restrains trade."  Tidmore, 932 F.2d at 1388.

In this case, ACS has alleged that it, as a distributor, was harmed by the

vertical conspiracy to exclude it from the Florida market by way of an agreement

between a competing distributor, White Cap, and the manufacturer that both

distributors sought to sell for, Meadow Burke.  ACS fails to meet the standard of

proving concerted action under § 1.

> 1. There is No § 1 Agreement When the Evidence is Equally Consistent
>    with an Inference of Independent Action

In considering an agreement under § 1, "there is the basic distinction

between concerted and independent action" of alleged anticompetitive actors.

Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761, 104 S. Ct. 1464, 1469,

79 L. Ed. 2d 775 (1984).  "Independent action is not proscribed" under § 1; only

concerted action is.  Id.  "A manufacturer of course generally has a right to deal, or

13

refuse to deal, with whomever it likes, as long as it does so independently." Id. (citing United States v. Colgate & Co., 250 U.S. 300, 307, 39 S. Ct. 465, 468, 63 L. Ed. 992 (1919)).

This distinction means that at the summary judgment stage, the plaintiff must present "evidence that tends to exclude the possibility that the manufacturer and nonterminated distributor[] were acting independently." Monsanto, 465 U.S. at 764, 104 S. Ct. at 1471; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007) ("[A]t the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently." (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986))). The terminated distributor, as the non-moving party, must "point to evidence which tends to exclude the possibility that the manufacturer was operating independently in making his determination to terminate the distributor." Helicopter, 818 F.2d at 1534. Mere equipoise of the evidence does not establish an agreement. Quality Auto Painting, 917 F.3d at 1267 ("[I]ndependent action is at least as plausible as concerted action pursuant to prior agreement; thus nothing 'tends to exclude the possibility of independent action,' or 'remove[s] . . . [this case] from the realm of equipoise and render[s] [this case] more probative of conspiracy . . . .'" (alterations in original) (citation omitted)); City of Tuscaloosa v.

14

Harcros Chems., Inc., 158 F.3d 548, 569 (11th Cir. 1998) ("[T]he plaintiffs'
circumstantial documentary evidence is in equipoise, and in the absence of further
evidence of collusion, summary judgment against the plaintiffs would be in
order."). ACS, "in other words, must show that the inference of conspiracy is
reasonable in light of the competing inference[] of independent action."
Matsushita, 475 U.S. at 588, 106 S. Ct. at 1356.

"The summary judgment standard in vertical restraint cases is more stringent
than in other areas of antitrust law because a higher possibility of capturing and
invalidating legitimate business conduct exists." DeLong Equip. Co. v.
Washington Mills Abrasive Co., 887 F.2d 1499, 1508 (11th Cir. 1989). Indeed, we
have observed that this standard even seems contrary to the general rule in
evaluating summary judgment "since it is at least arguable that a jury might
reasonably infer such an agreement from the existence of complaints by a
distributor and a manufacturer's response to those complaints by terminating the
offending distributor." Helicopter, 818 F.2d at 1533. But this antitrust standard
accounts for the purpose of the antitrust laws to only deter anticompetitive conduct,
not chill legitimate business practices. As such, "antitrust law limits the range of
permissible inferences from ambiguous evidence in a § 1 case." Matsushita, 475
U.S. at 588, 106 S. Ct. at 1356.

15

Furthermore, this standard means that evidence of mere complaints from a competitor to the manufacturer fails to establish a § 1 conspiracy.

> Mere complaints from other competing distributors are not sufficient in this regard since they are equally consistent with both an independent and a collusive interpretation. The distributor must, instead, adduce positive evidence which tends to exclude the possibility of unilateral action.

Helicopter, 818 F.2d at 1534 (footnote omitted). "This evidence 'need not be such that *only* an inference of conspiracy may be derived from it. It must, however, go beyond equivocal complaints and *tend* to exclude the inference of independent action.'" DeLong, 887 F.2d at 1509 (quoting Helicopter, 818 F.2d at 1534 n.4). This application of the standard protects a manufacturer's decision to deal or not deal with whomever it pleases, allowing it the benefit of hearing legitimate complaints. Thus, a decision to terminate a business relationship will not normally give rise to liability without concerted or other illegal action. See Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc., 710 F.2d 752, 773 (11th Cir. 1983).

Applying this standard, we affirmed the grant of summary judgment in Dunnivant v. Bi-State Auto Parts, holding that plaintiff Dunnivant, a retailer in the local auto parts market, failed to present evidence tending to exclude the possibility that one of his suppliers, Auto Electric, and a competitor, Paul Spence, acted independently when Auto Electric terminated its business relationship with

Dunnivant in favor of Spence after Spence complained.  851 F.2d 1575, 1582 (11th Cir. 1988).  Spence had complained that Dunnivant's customers were leaving their empty oxygen cylinders with Spence, leaving Spence responsible for returning the cylinders to the original oxygen supplier but without the benefit of the sale of the oxygen (which Dunnivant received).  Id. at 1578.  Spence threatened to pull his business with Auto Electric because of Auto Electric's relationship with Dunnivant.  Id.  Auto Electric initially decided to stay with Dunnivant, but it lost what turned out to be more substantial business with Spence.  Id.  Auto Electric's sales were cut by more than half when compared to the prior business with Spence, attributed to Dunnivant's insufficient purchasing practices and refusal to stock inventory.  Id.  After just over a year, Auto Electric terminated Dunnivant and reestablished business with Spence.  Id.  A former Auto Electric employee "testified that the only reason Auto Electric terminated business relations with Dunnivant was due to pressure from Paul Spence."  Id. at 1580.

Dunnivant sued Spence and Auto Electric pursuant to section 1 of the Sherman Act, alleging concerted action, and we held that the evidence did not tend to exclude the possibility of independent action.  Id. at 1579–81.  That Spence complained and Auto Electric subsequently listened was not enough to tend to exclude the inference of independent action under Monsanto, 465 U.S. at 764, 104 S. Ct. at 1471, and Helicopter, 818 F.2d at 1533–34.  Dunnivant, 851 F.2d at 1580–

81. "Mere complaints of illegal conspiracy that are equally consistent with permissible competition, without more, do not support even an inference of conspiracy." Id. at 1579. Auto Electric had independent and legitimate business reasons to terminate Dunnivant and reestablish a business relationship with Spence given that Spence's purchases per month had been more than twice as much as Dunnivant's turned out to be, and given its concern with Dunnivant's failure to consistently purchase Auto Electric's products, leading to the significant drop in Auto Electric's sales. Id. at 1580. Auto Electric had the right to "deal or not deal with customers for 'reasons sufficient to itself.'" Id. at 1581 (quoting Fla. Rock Indus., 710 F.2d at 772).

For similar reasons, after examining the evidence in this case, we conclude that ACS fails to meet the standard to prove a claim for a § 1 conspiracy.

2. ACS's Evidence is Equally Consistent With Competitive Conduct

ACS argues that the evidence "tends to exclude the possibility of independent action by the manufacturer [Meadow Burke] and distributor [White Cap]." See Monsanto, 465 U.S. at 768, 104 S. Ct. at 1473. ACS argues that interactions between White Cap and Meadow Burke employees demonstrate an agreement between the two companies for Meadow Burke to terminate its Florida relationship with ACS. It urges that Meadow Burke only changed its mind about ACS after White Cap threatened to pull its business, and they met so Meadow

18

Burke could reassure White Cap of exclusivity in the future, indicating that there was an agreement. While the evidence shows that Meadow Burke's Mike Wolstenholme facilitated ACS's Florida entry and indicated a continuing supply of Meadow Burke products for projects, and that changed only after White Cap's "pressure," the following analysis demonstrates that the evidence is at least equally consistent with an inference of independent, competitive conduct.

ACS places great emphasis on the internal email from Lori Dykes of Meadow Burke that followed the clerical error and first documented the expressed dismay of Doug Bartle at White Cap that Meadow Burke was initiating a Florida relationship with ACS. The impact of this "smoking gun" email, as ACS labels it, is best understood in the context of the status quo beforehand.

White Cap, by all accounts, had enjoyed a nearly exclusive relationship with Meadow Burke in Florida up until that point, though not formalized in an agreement. While ACS began working with Meadow Burke's Wolstenholme on a Florida presence, White Cap was unaware that its otherwise exclusive dealer was making plans to no longer be exclusive.

About three months passed before any indication to White Cap of ACS's entry into Florida. Then, on or before July 13, 2016, Meadow Burke's Dykes accidently sent paperwork for the ACS project to White Cap. This was how White Cap learned that Meadow Burke was supplying an ACS project, a clerical error

seemingly brought about because it was so common for Meadow Burke to be sending its project documentation in Florida to White Cap, and White Cap only.

White Cap's Bartle called Dykes on July 13, 2016, and expressed surprise and indignation that Meadow Burke was permitting a competitor to distribute Meadow Burke's tilt product in Florida. Bartle threatened to take White Cap's business away from Meadow Burke and shift to Meadow Burke's main competitor, Dayton Superior, with whom he would soon be meeting. Immediately after that telephone call from Bartle, Dykes sent the internal "smoking gun" email to others at Meadow Burke.

The email was sent from Dykes—who had been the only one to have then communicated with White Cap directly at that point on the issue—to Meadow Burke executives Greg Arnett and Mike Wolstenholme. Wolstenholme had been the only Meadow Burke employee in contact with ACS about Florida. The email's subject line read "John House," clearly referring to Bartle's contact at the competitor, Dayton Superior. Dykes wrote that she had "just talked to Bartle and W[hite] C[ap] is very upset and totally disappointed in M[eadow ]B[urke]!" White Cap could "not believe [Meadow Burke] let someone else sell Tilt in F[lorida]," said Dykes, nor could Dykes herself. Dykes also reported that she had learned that Bartle and John House of Dayton Superior would be meeting the next day to discuss tilt supplies in the Carolinas. Dykes was "sure Florida as well"

20

would be discussed, given White Cap's learning of the newly minted ACS-Meadow Burke Florida relationship.   Dykes explained that this meant that Meadow Burke needed "damage control ASAP."   Dykes said that "upper management" had already met that day to discuss bringing in more products to supply but that the purchase order from White Cap was "now on hold because [Meadow Burke was] letting someone else into Florida," that someone else being ACS.   Dykes closed the email by strongly expressing her thoughts about what this meant for Meadow Burke: "Please confirm we will NO Longer allow anyone other than W[hite ]C[ap] to sell Tilt in Florida.  Please call to discuss how we can move forward and fix what we have done."  In other words, Dykes thought Meadow Burke must terminate future business with ACS.

After the Dykes email, Meadow Burke internally made the decision to stop any future business with ACS.  Arnett and Wolstenholme took the information they had learned from Dykes to their boss, Doug Crawford, Vice President of Sales at Meadow Burke.  In turn, Crawford informed his superior, Meadow Burke's President Eoin Lehane, that it was decided Meadow Burke should not add ACS to its Florida distribution.  As noted above, the internal Meadow Burke emails between Lehane, Crawford, Arnett, and Wolstenholme indicate that decision was finalized on July 20.  Crawford testified that the decision about ACS was made because White Cap had performed well for Meadow Burke in Florida, White Cap

21

had bought a lot of equipment from and invested in other ways in Meadow Burke, and it would not be fair to allow ACS to take advantage of these efforts on the back of White Cap. Meadow Burke did decide to supply the one project that it had agreed to supply—the project that led to White Cap's learning of ACS's work with Meadow Burke in Florida—but not others. As a result, Arnett and Wolstenholme informed their White Cap and ACS contacts of the same.

At this point, the evidence demonstrates that Meadow Burke had made an independent decision to terminate ACS. There is no evidence that Dykes and Bartle made an agreement on the phone on July 13. There is also no evidence that Wolstenholme and Bartle made an agreement during their subsequent phone call on that same day. There is no other evidence suggesting a conspiracy at this point in the sequence of events. Certainly, the evidence demonstrates that White Cap expressed its unhappiness, through Bartle, with Meadow Burke using ACS as a distributor and had at least suggested that White Cap would engage a different supplier if ACS continued to distribute Meadow Burke. But evidence of a complaint, even a strong one, like this is not anticompetitive conduct.

ACS also relies on other evidence of subsequent events to argue that an agreement was in fact made when viewed with the developments on July 13, 2016. On July 25, Meadow Burke's Wolstenholme and Arnett met with White Cap's Bartle and others at White Cap's Tampa, Florida offices; Meadow Burke conveyed

22

to White Cap its decision to honor the single Florida project and to not use ACS for future projects in the state.  There is no evidence of the discussion involving an agreement for Meadow Burke to terminate ACS (a decision that had already been made and reported to White Cap) or for White Cap in return to promise to buy from Meadow Burke, or any other agreement.

Later that day, Wolstenholme and Arnett communicated Meadow Burke's decision to brothers Jason and Jacob Reuter, principals of ACS.   ACS emphasizes three facts that it learned at this meeting.  First, ACS says Wolstenholme "admitted" that there had been pressure from White Cap, which precipitated the termination decision.   Second, Wolstenholme referenced projects outside of Florida, those in the northeast, suggesting that no one had taken issue with those projects so ACS should just let Florida go.  And third, Wolstenholme said that he and one of the Reuters had done everything they ever said they would do until that point.

As a final piece of evidence of conspiracy, ACS relies upon a later statement by White Cap's Bartle that he told an employee of Flagship:  "We sent him packing.  We do millions a year with Meadow Burke."

Although the foregoing evidence raises an inference that there might have been an agreement between Meadow Burke and White Cap—Meadow Burke agreeing to use White Cap only and terminate ACS in Florida in exchange for

23

White Cap continuing to purchase from Meadow Burke—it is evidence of "conduct which is as equally consistent with permissible competition as it is with an illegal conspiracy" and "does not, without more, support . . . an inference of conspiracy." See Helicopter, 818 F.2d at 1533. Several reasons persuade us.

The chronology of events suggests that Meadow Burke independently decided that it was in its best interest to sell its product in Florida exclusively through the White Cap distributorship and not ACS anymore. Prompted by the threat from White Cap to move its business from Meadow Burke to Dayton Superior—another manufacturer that was Meadow Burke's main competitor—Crawford, Arnett, and Wolstenholme internally conferred and decided that it was in the best interest of Meadow Burke to maintain the status quo, which had existed before Wolstenholme authorized ACS to supply the Flagship project. Although the decision was prompted by White Cap's threat to divert its business to Dayton Superior, that decision was made without consulting White Cap, and was not finalized until July 20. From July 13 and through July 20, there had been no contact between Meadow Burke and White Cap, except Bartle's call to Dykes on July 13, and Wolstenholme's call back to Bartle that same day, but there is no evidence that either call involved any agreement between Meadow Burke and White Cap; indeed, Meadow Burke's decision was not finalized until July 20, a

24

week after those calls on July 13.  And Meadow Burke's decision was not communicated to White Cap until July 25.

ACS emphasizes Wolstenholme's perceived flip-flop—he agreed to have Meadow Burke supply ACS in Florida and then suddenly changed his mind only after White Cap's threats—and argues that it was his decision alone, as Director of Tilt Up, to terminate ACS.   ACS asserts that Wolstenholme felt the pressure, evidencing an agreement.  Although the contemporaneous emails between Crawford, Arnett, and Wolstenholme strongly point to the decision having been made by the sales manager of the region that included Florida (Arnett) and a superior (Crawford), or at least jointly by the three of them, it is not significant which of them, or all of them jointly, made the decision.  The significant fact is the evidence points to its being a decision that was made independently by Meadow Burke, rather than being an agreement with White Cap.  In other words, the evidence is at least equally consistent with the decision being an independent one, without agreement, conspiracy, or combination.  That Wolstenholme, or anyone else, knew of White Cap's "threats" when making the decision is not enough under the antitrust law. See Winn v. Edna Hibel Corp., 858 F.2d 1517, 1520 (11th Cir. 1988) (holding that threats from a competitor "by itself [is] not sufficient to establish a case for the jury; a manufacturer may legitimately respond to pressure from a [distributor] in order to avoid losing that particular dealer's business.").

25

The same was true in Dunnivant; Spence complained to Auto Electric, threatening to take his business elsewhere if Auto Electric remained in business with Dunnivant. 851 F.2d at 1580. Despite there being evidence that Auto Electric felt "pressure" from Spence, the conclusion on summary judgment was that Auto Electric made the independent decision to terminate business relations with Dunnivant and go back to Spence. Id. at 1581. White Cap's pressure in this case is almost identical. In this case, as in Dunnivant, ACS has failed to establish concerted action.

Supporting our conclusion is the fact that Meadow Burke's decision was clearly in its best interest. For a considerable period, White Cap had operated as Meadow Burke's near-sole and exclusive distributor in Florida, although there was no written distributorship agreement. White Cap had hired over 100 employees with at least 10 years of experience with Meadow Burke products. White Cap had substantially invested and spent considerable effort in promoting the Meadow Burke product, and resulting in part from White Cap's efforts, the Meadow Burke product had captured 65% of the Florida market and was able to sell through a distributor with its own 75% share of the market. If White Cap carried through on its threat to transfer its business to Dayton Superior, Meadow Burke would have had an uphill battle to maintain its market share. Moreover, Meadow Burke believed that White Cap had performed well, and Meadow Burke was satisfied

26

with the amount of business it already had in Florida and wanted to avoid burdening its engineering department.[7]  And considering White Cap's investment and promotion of Meadow Burke's product, letting ACS "piggyback" on White Cap's efforts and built-up goodwill could discourage distributors from making similar investments in the future.

ACS has merely adduced <u>some</u> evidence of anticompetitive conduct on the part of Meadow Burke.  But ACS has failed to establish facts that exclude the possibility that Meadow Burke acted independently.  The evidence is at least as consistent with the fact that Meadow Burke, with the benefit of White Cap's concerns, independently made the decision to stop any more business with ACS.  Labelling the comments of White Cap as "pressure" or "threats" alone does not rise to its own level of anticompetitive conduct for a § 1 claim.

On the White Cap side of the coin, the conclusion is the same.  The evidence is at least equally consistent with White Cap having made an independent decision as with the possibility of an illegal agreement with Meadow Burke.  There is no evidence that White Cap expressly agreed to continue distributing Meadow Burke's product after learning that Meadow Burke would not use ACS for future

---

[7]    ACS argues that Meadow Burke contrived the engineering department concern as a post hoc and pretextual business reason for ACS's termination to protect White Cap.  Whether or not ACS is correct on this point is of little moment given the other evidence and the fact that such evidence would not tend to exclude the possibility of independent action on the part of Meadow Burke and White Cap.

projects. And White Cap had every incentive to do so for its own business reasons. White Cap had invested substantially in promoting the Meadow Burke product in Florida, had captured about 75% of the Florida market, and clearly believed—as ACS does—that the Meadow Burke product was the superior product. If White Cap transferred its business to competitor Dayton Superior, abandoning the Meadow Burke product, it would be in the position of having to undo the substantial work it had done previously in promoting Meadow Burke. For example, if it abandoned the Meadow Burke product, it could expect ACS (or some other distributor) to distribute the Meadow Burke product in Florida in its stead, which would take advantage of all the goodwill and promotion work that White Cap had done in the past and without the need to do all the legwork. And White Cap would be in the awkward position of telling its general contractor customers that—notwithstanding its many years of promoting the Meadow Burke product as the superior product—it now thought that the Dayton Superior product was best. White Cap would be paddling upstream against the presumptive 65% of the market then being served by the Meadow Burke product.

Again, our decision in <u>Dunnivant</u> involves almost identical facts and persuasively supports our decision in this case. Auto Electric had enjoyed a long-term relationship with Spence and decided to return to the status quo after trying out some business with Dunnivant. Of course, Auto Electric's decision was

28

informed by some time of working with Dunnivant, unlike in our case. In one sense, however, the evidence in our case points more forcefully to independent action. The business reasons for Meadow Burke to stick with its exclusive distributorship arrangement with White Cap were so clear that it immediately chose White Cap over ACS when first presented with White Cap's threat to move its purchases to Dayton, Meadow Burke's competitor. Thus, Meadow Burke's business reasons were probably stronger than Auto Electric's in Dunnivant. And the other facts are almost identical, including the pressure from White Cap in this case and Spence in Dunnivant.

The lack of evidence of a conspiracy in this case contrasts with DeLong v. Washington Mills Abrasive Co., on which ACS relies to argue that even without direct evidence of a discussion to terminate the plaintiff between the alleged conspirators, the case must be sent to a factfinder for a finding of conspiracy. 887 F.2d 1499, 1508 (11th Cir. 1989). Of course, ACS's argument misses the point; in sharp contrast to the ample evidence of concerted action in DeLong, see id. at 1508–12, there is no evidence of an express agreement between Meadow Burke and White Cap, and no evidence of any kind "that tends to exclude the possibility of independent action," Monsanto, 465 U.S. at 768, 104 S. Ct. at 1473, on the part of Meadow Burke and White Cap. Without enough evidence—direct or circumstantial—of facts that "tend to exclude the inference of independent action,"

29

ACS cannot avoid summary judgment.  DeLong, 887 F.2d at 1509 (quoting

Helicopter, 818 F.2d at 1534 n.4) (emphasis removed).  ACS has not presented

direct evidence of an agreement, and ACS's circumstantial evidence, as outlined

above, does not tend to exclude the conclusion that White Cap and Meadow Burke

acted independently.

Therefore, we hold that the evidence is at least equally consistent with

Meadow Burke having made an independent decision to terminate ACS as it is

with an inference of concerted action.  And we conclude the evidence is at least

equally consistent with White Cap having made an independent decision to

continue distributing the Meadow Burke product as it is with it having engaged in

concerted action.  Thus, we cannot conclude that White Cap acted in a manner

rising to the level of anticompetitive conduct necessary for a § 1 claim.  Summary

judgment was appropriately granted.

B. Section 2 Claims[8]

The district court also granted summary judgment on ACS's monopolization

and attempted monopolization claims against White Cap pursuant to section 2 of

the Sherman Antitrust Act.  We hold that district court did not err in doing so.

---

[8]    We concluded in Part II.A above that ACS failed to establish its allegation of the
agreement or conspiracy between Meadow Burke and White Cap, and thus we concluded that
ACS's § 1 claim fails.  In Part II.B below, we note that ACS must prove some anticompetitive
conduct to establish its § 2 claims, and we note that the only anticompetitive conduct that ACS
asserts to satisfy that requirement is the same alleged agreement or conspiracy between Meadow
Burke and White Cap.  Thus, we conclude in Part II.B that ACS's § 2 claims fail for failure to

Section 2 deems it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce."  15 U.S.C. § 2.  A § 2 monopolization claim "has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power."  Morris Commc'ns Corp. v. PGA Tour, Inc., 364 F.3d 1288, 1293–94 (11th Cir. 2004) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570–71, 86 S. Ct. 1698, 1704, 16 L. Ed. 2d 778 (1966)).  "The second element requires predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market."  Id. at 1294 (citing United States v. Microsoft, 253 F.3d 34, 58 (D.C. Cir. 2001)).

Similarly, "a claim for attempted monopolization under § 2" requires proof of "three things: '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a

---

establish the only anticompetitive conduct it asserts.  In light of these conclusions, we need not address White Cap's suggestion that—even if such concerted action between Meadow Burke and White Cap were established—ACS's claims would nevertheless fail because a manufacturer is free to enter into an exclusive distributorship arrangement with a distributor, and because the antitrust law looks with favor on such exclusive arrangements, at least in the absence of substantial harm to competition.  See Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1653c (4th ed. 2017); Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240, 245 (2d Cir. 1997); Paddock Publ'ns, Inc. v. Chi. Trib. Co., 103 F.3d 42, 44–47 (7th Cir. 1996); Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 735 (9th Cir. 1987); H & B Equip. Co. v. Int'l Harvester Co., 577 F.2d 239, 245–46 (5th Cir. 1978); Packard Motor Car Co. v. Webster Motor Car Co., 243 F.2d 418, 420 (D.C. Cir. 1957); see also McWane, Inc. v. F.T.C., 783 F.3d 814, 835 (11th Cir. 2015).

31

dangerous probability of achieving monopoly power.'" Duty Free Ams., Inc. v. Estee Lauder Cos., 797 F.3d 1248, 1263 (11th Cir. 2015) (quoting Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 113 S. Ct. 884, 890–91, 122 L. Ed. 2d 247 (1993)).

Section 2, in contrast to § 1, "covers both concerted and independent action, but only if that action 'monopolize[s],' 15 U.S.C. § 2, or 'threatens actual monopolization,'" which is "a category that is narrower than restraint of trade" in § 1. Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 190, 130 S. Ct. 2201, 2208–09, 176 L. Ed. 2d 947 (2010). "Monopoly power may be equally harmful whether it is the product of joint action or individual action." Id.

Despite this difference, ACS based both of its § 2 claims, as conceded in its briefs and at oral argument, on the same exact anticompetitive conduct as its § 1 claim—i.e., the alleged concerted action between Meadow Burke and White Cap to refuse to have Meadow Burke supply ACS in Florida. Although concerted action is not required for a § 2 claim, some "predatory or exclusionary act[]," Morris, 364 F.3d at 1294—i.e., some anticompetitive conduct—is required. Because the only anticompetitive conduct asserted by ACS to support its § 2 claims is that same alleged concerted action and because we have already concluded that ACS has failed to establish that concerted action, it follows that ACS has failed to prove conduct to establish either of its § 2 claims. Therefore,

32

because the evidence does not support the only anticompetitive conduct asserted,

as we have explained in analyzing the § 1 claim, we conclude that the district court

did not err in granting summary judgment on ACS's monopolization and attempted

monopolization claims pursuant to § 2.[9]

C.  Tortious Interference with a Business Relationship

ACS's final claim was for tortious interference with a business relationship.

Such a claim requires proof of the following elements:

> (1) improper action or wrongful conduct by the defendant without
> privilege; (2) the defendant acted purposely and with malice with the
> intent to injure; (3) the defendant induced a breach of contractual
> obligations or caused a party or third parties to discontinue or fail to
> enter into an anticipated business relationship with the plaintiff; and
> (4) the defendant's tortious conduct proximately caused damage to the
> plaintiff.

Trico Env't Servs., Inc. v. Knight Petroleum Co., 849 S.E.2d 538, 545 (Ga. Ct.

App. 2020) (quoting Dalton Diversified, Inc. v. AmSouth Bank, 270 Ga. App. 203,

208–09, 605 S.E.2d 892, 897–98 (2004)).  Georgia law recognizes a privilege of

---

[9]  ACS argued that the district court ruled sua sponte, in violation of Federal Rule of Civil Procedure 56(f), on the issue of specific intent to monopolize for ACS's attempted monopolization claim.  We reject this argument because the district court's ruling was not sua sponte.  Although White Cap's briefing to the district court focused only on the § 1 claim, the motion for summary judgment itself sought judgment on all of ACS's claims.  In any event, given that all of ACS's antitrust claims relied upon the same alleged anticompetitive conduct, without the establishment of such conduct, ACS's attempt claim fails regardless of the intent element.  Cf. Morris, 364 F.3d at 1293 n.10 ("[T]he elements of the two offenses [monopolization and attempt to monopolize] differ in only one material respect: attempt to monopolize requires specific intent to achieve monopoly power. Therefore, the attempt claim in this case is more difficult to maintain and prove.  Because Morris does not withstand summary judgment on its monopolization claim, it cannot maintain its attempt claim." (citation omitted)).

33

"fair competition." Orkin Exterminating Co. v. Martin Co., 240 Ga. 662, 666, 242

S.E.2d 135, 139 (1978). "The competitor's privilege is lost," for the purposes of

the first element of a tortious interference claim, "when an illegal restraint of trade

or competition under federal or state statutes is created or continued." Am. Bldgs.

Co. v. Pascoe Bldg. Sys., Inc., 260 Ga. 346, 349, 392 S.E.2d 860, 863 (1990).

ACS conceded in its brief and at oral argument that its tortious interference

claim relies on the same theory of conduct as its other claims—the alleged

concerted action of White Cap and Meadow Burke. ACS argues that the district

court erred in holding that there was no genuine issue of material fact that White

Cap acted properly and with the privilege afforded to legal competition. Having

failed to prove its only theory—the concerted action as "an illegal restraint of trade

or competition under federal . . . statutes"—ACS cannot establish a tortious

interference claim. Therefore, summary judgment was appropriately granted on

the tortious interference claim.

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary

judgment in favor of White Cap.[10]

---

[10]    Because we affirm the entry of summary judgment and dismissal of ACS's case, ACS's
argument regarding reassignment is moot. Moreover, the argument is without merit.

AFFIRMED.[11]

---

[11]     On October 29, 2020, ACS filed a motion for this Court to take judicial notice of a merger involving White Cap in October 2020. White Cap filed a response to this motion and simultaneously moved for sanctions against ACS. Because, as we explain, all of ACS's claims rely on the theory of anticompetitive conduct comprised of the alleged agreement between White Cap and Meadow Burke in 2016, and because ACS failed to prove such an agreement, we deny as moot ACS's motion for judicial notice. White Cap's motion for sanctions is also denied.